OPINION
{¶ 1} Defendant-appellant, Earl A. Johnson, appeals the judgment of the Franklin County Court of Common Pleas, entered following a jury trial, convicting appellant of two counts of murder with firearm and gang specifications. The court also convicted appellant of one count of having a weapon under disability ("WUD"), following a bench trial. *Page 2 
 {¶ 2} This case arises out of the May 20, 2006 murder of Trilane Johnston ("Johnston"). We have gleaned the following facts from the record adduced at trial. In May 2006, Tasia Johnson ("Johnson") was living in Columbus at the Capital Park Apartments with her mother and sister. Johnson is appellant's niece. Approximately ten days prior to Johnston's death, Johnson witnessed appellant and Johnston arguing in the parking lot of the Capital Park Apartments. She explained, "It was just an argument. It was like Bloods and Crips, they was arguing. And they didn't fight or nothing." (Tr. I, 197.) According to Johnson, appellant was a "Blood" and Johnston was a "Crip."
 {¶ 3} On the evening of May 20, 2006, Johnson was among a group of people gathered in the parking lot of her apartment complex to socialize. Johnson was not drinking that night. At 10:15 she was seated in the back seat of her friend's white Pontiac Grand Am with her three-year-old son. Her friend, Jameelah Ali ("Ali"), was seated behind the wheel, and Lepedro Warner ("Warner") was in the front passenger seat. Another white car pulled up alongside the Grand Am and appellant exited that vehicle. He was wearing a red shirt, red pants, and a red hat. He appeared upset and was holding a long shotgun. Johnson leaned out the window and called for him to calm down. He said, "everything is going to be okay." (Id., 207.) Initially, the shotgun was not pointed at anyone in particular.
 {¶ 4} At this point, Warner exited Ali's car, and Ali drove out of the parking area and out to the entrance to the complex. While parked at the entrance, Johnson heard nine shots. The women drove to the Agler Market to call police. When they returned, appellant was lying on the ground and Johnson thought he was dead. *Page 3 
 {¶ 5} Ali testified that when appellant arrived in the parking lot, she was talking with Johnston, who was standing beside Ali's vehicle. She testified that Johnson was in the front passenger seat, and that Johnson's young son was in the rear seat, along with Warner and Johnson's cousin, Antonio Williams ("Williams"). Ali stated that appellant's anger focused on Johnston. The two men argued, but Ali did not hear what they said. Before she departed from the parking lot, Antonio and Warner exited the vehicle. Johnston was lying on the ground in front of Ali's car. About five minutes after she drove to the complex entrance, she heard "two, very loud shots that sounded like a shotgun. And then it was like six shots from like a pistol." (Id. at 226.) On cross-examination, Ali testified that Johnston drew a pistol when appellant produced his shotgun.
 {¶ 6} Warner testified that he and his girlfriend shared an apartment on Agler Road, but that he frequently spent time at Capital Park Apartments because he knew many people who lived there. He spent the afternoon of May 20, 2006 smoking marijuana with his cousin, Johnston. That evening, they drove to Capital Park in Johnston's white Chrysler and parked by some dumpsters. They walked over to talk to Johnson and Ali. Warner got into Ali's car while Johnston slouched by the driver's window.
 {¶ 7} "Next I just happened to look over my shoulder and I see a shotgun hanging out of a car window pulling up." (Tr. II, 254.) Warner identified appellant as the person holding the shotgun. Warner explained, "[w]hen it stopped — excuse my French — the man jumped out saying who in the fuck wants to whip the Blood." (Id. at 255.) Warner went on to explain, "[t]hat means to me he was looking for trouble. He was wanting somebody to speak up and say something. It meant to me, actually, there was about to *Page 4 
be a gang war or something, because that is how he was approaching the car." (Id. at 256.) Warner associated appellant's red clothing with the "Bloods" and knew Johnston to be a member of the "Crips."
 {¶ 8} As Ali prepared to drive away, Warner exited the car and got into Johnston's car, which was still parked near the dumpsters. He laid across the front seat with his head down. According to Warner, appellant initially looked around the area, but then focused on Johnston, who ran up and produced a 9 mm semiautomatic pistol. Appellant returned to the rear seat of the vehicle in which he had been riding. Johnston handed his gun to Leroy Bradley ("Bradley"). The car in which appellant was sitting backed up and stopped, whereupon Johnston held up his hands and said "Fight me" and walked toward the car with his hands poised for a fistfight. The two men approached each other, whereupon Warner heard "boom, boom. And then you hear pop, pop, pop, pop pop." (Id. at 264.) When the shots began, Warner kept his head down until the firing ceased and "the screeching of tires stopped." (Id. at 265.)
 {¶ 9} When he looked up, Warner saw appellant "scooting on his butt" toward the shotgun, which lay on the ground some distance away from him. Warner ran over. He stated, "When I got there, it was like he had the gun in his hand halfway. So, I reached down and grabbed it, too. So, it was like a little baby struggle. So, I snatched it from him real hard. When I got two hands on it, I snatched real hard and it goes off." (Id., 269-270.) Then, "I hit the defendant with it three times in his head or up in his upper body." (Id. at 271.) This broke the barrel away from the stock.
 {¶ 10} Warner went over to Johnston, who could barely speak. Warner and two other men, Brian Dillow ("Dillow") and Jack Stein ("Stein"), loaded Johnston into the back *Page 5 
seat of Johnston's car. They planned to drive to a hospital, but instead they drove to Warner's apartment to call an ambulance. Warner ran into his apartment, threw the contents of his pockets onto his bed, including a bag of marijuana, and told his girlfriend to call an ambulance and to dispose of the part of the shotgun he still had in his possession. He acknowledged that he had a cell phone, but said he did not think to use it.
 {¶ 11} Bradley has two prior weapons convictions and Johnson testified that she knew Bradley to be a member of the "Crips." Bradley, too, frequently socialized at the Capital Park Apartments. He testified that he had gone there on the night of May 20, 2006, with Johnston and Warner. He watched as a white four-door vehicle pulled in to the parking lot, appellant jumped out armed with a shotgun, and heard appellant say, "there he is. That is him right there." (Id. at 388.) Johnston pulled out his pistol. The two men aimed their weapons at each other "[a]t the same time they are dancing around the minivan." (Id. at 377.) Appellant returned to the car in which he had arrived. Johnston handed Bradley his pistol, and approached appellant with his hands up, prepared for a fight. Johnston yelled at appellant. Appellant responded that he just wanted to talk, but raised the shotgun and fired one shot. "Trilane Johnston flew in the air and landed on his back." (Id. at 385.) Bradley raised the pistol and fired three to five shots, emptying the clip. Appellant fell, then fired a shot at Bradley, but missed.
 {¶ 12} Michael Coats, who lived nearby in the Capital Park Apartments, did not see any of these events, but heard shots while walking home that evening. He testified that the initial shots were fired in rapid succession; then, following a pause, he heard a final shot. He saw appellant lying on the ground when he returned home. *Page 6 
 {¶ 13} Kevin Jackson ("Jackson"), of the Columbus Police Crime Scene Search Unit, collected clothing and gunshot residue exemplars from Warner, Dillow, and Stein while police detained the three men that evening. Police also obtained a gunshot residue exemplar from Johnston. Jackson and his team took photographs and measurements at the Agler Road scene, collected property, and removed a car to the crime laboratory for later processing. He also took photographs and collected evidence at the Capital Park Apartments scene. They photographed Johnston's body at the morgue, and collected his property. Later, they returned to the Agler Road scene to execute a search warrant. During this search, they recovered a shotgun stock from the roof of Warner's apartment.
 {¶ 14} Firearms expert Mark Hardy opined that the stock and barrel collected from the crime scenes were parts of the same shotgun. He determined that the shotgun fired the three shotgun casings collected from the scene of the shootings. He had also examined a Taurus pistol recovered from the scene, and determined that it was operable and it fired four spent 9 mm casings and two of four bullet fragments submitted to him for examination.
 {¶ 15} Daniel Davison, of the Ohio Bureau of Criminal Identification and Investigation ("BCI"), examined the gunshot residue kits performed on Johnston, Warner, Dillow, Stein, and Williams. All five samples had been collected outside the recommended two-hour period, and all kits tested negative for gunshot residue. BCI crime laboratory technician Debra Lambourne testified that she conducted DNA testing, which revealed that Bradley was the source of DNA found on the grip of the Taurus handgun. Appellant could not be excluded as a contributor to a mixture of DNA found on *Page 7 
the shotgun barrel. Johnston, Warner, Dillow, and Stein, however, were excluded. Blood extracted from the shotgun stock and barrel matched appellant's DNA.
 {¶ 16} Detective Thaddeus Alexander, assigned to the Strategic Response Bureau within the Criminal Information Unit, testified as an expert in the field of gang identification. He discussed the Crips and Bloods and the existence of gangs in the Columbus area. He did not testify as to any of the individuals involved in the present case. He testified that the Bloods and Crips are nationwide gangs and mortal enemies. Various gangs have controlled the Capital Park Apartment complex over the years. Gang identifiers include the use of signs, symbols, and colors. Bloods are associated with the color red, while Crips are associated with the color blue. Members are also identified by their associates and through self-identification.
 {¶ 17} The assistant coroner who performed the autopsy on Johnston stated that Johnston suffered a gaping shotgun wound to his right leg, which lacerated his femoral artery, causing him to bleed to death.
 {¶ 18} Appellant advances four assignments of error for our review, as follows:
 First Assignment of Error: The evidence was legally insufficient to establish appellant was responsible for the victim's death.
 Second Assignment of Error: The court erroneously overruled appellant's motion for acquittal pursuant to Criminal Rule 29.
 Third Assignment of Error: Appellant's convictions were against the manifest weight of the evidence.
 Fourth Assignment of Error: The evidence does not support appellant's conviction on gang specification. *Page 8 
 {¶ 19} Appellant's first and second assignments of error challenge the sufficiency of the evidence supporting his two convictions of murder, violations of R.C. 2903.02. In his third assignment of error appellant argues that his convictions are against the manifest weight of the evidence. Though sufficiency and manifest weight summon us to apply two different standards of review, we will discuss all three assignments of error together because they both call for a detailed review of the evidence and because appellant advances virtually the same arguments in support of each.
 {¶ 20} The Supreme Court of Ohio outlined the role of an appellate court presented with a sufficiency of evidence argument in State v.Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
See, also, Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781,61 L.Ed.2d 560.
 {¶ 21} This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 175,20 OBR 215, 485 N.E.2d 717. Rather, the sufficiency of evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."Jackson, supra, at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79, 80, 24 O.O.3d *Page 9 
150, 434 N.E.2d 1356. The reviewing court does not substitute its judgment for that of the fact finder. Jenks, supra, at 279.
 {¶ 22} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 23} The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967), 10 Ohio St.2d 230,39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse on "manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction." Thompkins, supra, at 387.
 {¶ 24} Count One of the indictment alleged that appellant purposely caused Johnston's death in violation of R.C. 2903.02(A). Count Two alleged that appellant's commission of a felony proximately caused Johnston's death, in violation of R.C. 2903.02(B). As amended, Count Two charged that appellant caused Johnston's death as the proximate result of a felonious assault committed in violation of R.C. 2903.11.
 {¶ 25} Section 2903.02 of the Ohio Revised Code, which defines the crime of murder, provides, in pertinent part:
 (A) No person shall purposely cause the death of another * * *. *Page 10 
 (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
 {¶ 26} The crime of felonious assault is defined as "[c]aus[ing] or attempt[ing] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2).
 {¶ 27} Appellant argues that the evidence was insufficient and that his convictions were against the manifest weight of the evidence because the only eyewitnesses to the shooting are unworthy of belief because they are "a convicted felon who admits to emptying a pistol aimed at appellant and a man who admits blasting him with a shotgun, then clubbing him causing severe head injuries." (Brief of Appellant, 8.) He also points out that Warner had been drinking and smoking marijuana on the evening in question and Warner admitted lying to police when the police first interviewed him on the night of the shooting, telling police that he had been at his apartment all night. Appellant also argues that neither Warner nor Bradley is credible because both men testified pursuant to plea agreements.
 {¶ 28} Appellant argues that the fact his blood was found on the shotgun barrel does not implicate him in Johnston's shooting because appellant's blood could have been deposited on the barrel when he was hit with it. He also points out that the police did not test him for gunshot residue, nor was there any testimony that his fingerprints were found anywhere on the shotgun.
 {¶ 29} In response, appellee, State of Ohio ("appellee"), argues that, under both the sufficiency and manifest weight standards of review, the jury's credibility *Page 11 
determinations are entitled to great deference. State v. Sexton, Franklin App. No. 01AP-398, 2002-Ohio-3617, ¶ 30; State v.Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, ¶ 28. Appellee also points out that Ali and Johnson's testimony corroborated Warner and Bradley's versions of events in several respects, and that the physical evidence corroborated Warner's testimony. Warner testified that appellant was holding the shotgun near his leg when he fired it, and that appellant fired at Johnston from a low angle. This is consistent with the fact that Johnston was wounded in the leg.
 {¶ 30} It is true that there are certain inconsistencies in the witness' testimony in this case. "Conflicting evidence and inconsistencies in the testimony, however, generally do not render the verdict against the manifest weight of the evidence." State v.McDaniel, Franklin App. No. 06AP-44, 2006-Ohio-5298, ¶ 16, citingState v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, ¶ 21. "While the jury may take note of the inconsistencies and resolve or discount them accordingly, such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." (Citation omitted.) State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, at *7; see, also, State v.Tomak, Franklin App. No. 03AP-1188, 2004-Ohio-6441, ¶ 17
(inconsistencies in witness' testimony generally do not render a verdict against the manifest weight of the evidence); State v. Rogers, Franklin App. No. 04AP-705, 2005-Ohio-2202, ¶ 19, discretionary appeal not allowed, 106 Ohio St.3d 1506, 2005-Ohio-4605, 833 N.E.2d 1249 (the existence of conflicting evidence does not render the evidence insufficient as a matter of law).
 {¶ 31} "The fact finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the *Page 12 
witness and the examiner, and watch the witness's reaction to exhibits and the like. Determining credibility from a sterile transcript is a [H]erculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact finder."State v. Thompson (1998), 127 Ohio App.3d 511, 529, 713 N.E.2d 456, discretionary appeal not allowed, 83 Ohio St.3d 1451, 700 N.E.2d 334.
 {¶ 32} The trier of fact is in the best position to take into account conflicting evidence and inconsistencies, along with each witness' manner and demeanor, and to determine whether the witness' testimony is credible. State v. Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, ¶ 58;State v. Clarke (Sept. 25, 2001), Franklin App. No. 01AP-194. Thus, jurors need not believe all of a witness' testimony, but may accept only portions of it as true. Raver, supra, at ¶ 21; State v.Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v.Caldwell (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096.
 {¶ 33} Upon review of all of the evidence, and according due deference to the jury's credibility determinations and resolution of factual inconsistencies in the testimony, we conclude that a rational jury could have reasonably concluded that appellant is guilty beyond a reasonable doubt of all counts upon which appellant was convicted. The jury heard from two eyewitnesses who testified that they saw appellant shoot Johnston, as well as numerous other witnesses who corroborated the eyewitness' testimony in various respects. In addition, appellant's own niece testified she witnessed appellant and Johnston arguing a few days prior to Johnston's shooting, and saw appellant immediately before the shooting, holding a shotgun. Her friend testified she saw appellant point the shotgun at Johnston, and, moments later, heard shotgun blasts followed by several handgun shots, which corresponds to the shell casings found at the scene. Based upon *Page 13 
our review of the evidence, we conclude that the verdict was not based upon insufficient evidence and was not against the manifest weight of the evidence. Accordingly, we overrule appellant's first, second, and third assignments of error.
 {¶ 34} In support of his fourth assignment of error, appellant argues that the evidence was insufficient to support the jury's guilty verdict as to the gang specification.
 {¶ 35} Section 2929.14(I) of the Ohio Revised Code provides, "If an offender who is convicted of or pleads guilty to a felony that is an offense of violence also is convicted of or pleads guilty to a specification of the type described in section 2941.142 of the Revised Code that charges the offender with having committed the felony while participating in a criminal gang, the court shall impose upon the offender an additional prison term of one, two, or three years."
 {¶ 36} Pursuant to R.C. 2941.142(A), "Imposition of a mandatory prison term of one, two, or three years pursuant to division (I) of section2929.14 of the Revised Code upon an offender who committed a felony that is an offense of violence while participating in a criminal gang is precluded unless the indictment * * * specifies that the offender committed the felony that is an offense of violence while participating in a criminal gang." Pursuant to R.C. 2923.41:
 (A) "Criminal gang" means an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:
 (1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.
 (2) It has a common name or one or more common, identifying signs, symbols, or colors. *Page 14 
 (3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.
 (B)(1) "Pattern of criminal gang activity" means, subject to division (B)(2) of this section, that persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more of any of the following offenses:
 (a) A felony or an act committed by a juvenile that would be a felony if committed by an adult;
 (b) An offense of violence or an act committed by a juvenile that would be an offense of violence if committed by an adult;
 (c) A violation of section 2907.04, 2909.06, 2911.211 [2911.21.1], 2917.04, 2919.23, or 2919.24 of the Revised Code, section 2921.04 or 2923.16 of the Revised Code, section 2925.03 of the Revised Code if the offense is trafficking in marihuana, or section 2927.12 of the Revised Code.
 (2) There is a "pattern of criminal gang activity" if all of the following apply with respect to the offenses that are listed in division (B)(1)(a), (b), or (c) of this section and that persons in the criminal gang committed, attempted to commit, conspired to commit, were in complicity in committing, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in committing:
 (a) At least one of the two or more offenses is a felony.
 (b) At least one of those two or more offenses occurs on or after January 1, 1999.
 (c) The last of those two or more offenses occurs within five years after at least one of those offenses.
 (d) The two or more offenses are committed on separate occasions or by two or more persons. *Page 15 
 {¶ 37} Appellant argues that he was convicted of the gang specification solely upon evidence that he is a member of the "Bloods." He argues that there was no evidence demonstrating that Johnston's killing was part of appellant's participation in the activities of a criminal gang. He also argues that there was insufficient evidence that the "Bloods" constitute a "criminal gang" as defined in R.C. 2923.41(A).
 {¶ 38} In response, the state argues that the evidence of appellant's and Johnston's earlier gang-related argument, coupled with appellant's statement, "Who in the fuck wants to whip the Blood?", is sufficient evidence to prove that Johnston's killing was part of appellant's participation in the Bloods' criminal gang activities. However, the state concedes that the evidence was insufficient to establish that the "Bloods" is a criminal gang as defined in R.C. 2923.41. Specifically, the state concedes that it adduced insufficient evidence that "[t]he persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity." R.C. 2923.41(A)(3).
 {¶ 39} Though Detective Alexander testified generally that gangs commit various crimes, he did not offer testimony that any members of the "Bloods" committed any of the crimes listed in R.C. 2923.41(B)(1), or that any such crimes meet the additional criteria set forth in R.C.2923.41(B)(2). Moreover, because appellant's WUD charge was tried to the court, there was insufficient evidence for the jury to find appellant had engaged in two felonious predicate offenses, on separate occasions, in order to establish the "pattern of criminal gang activity" element. *Page 16 
 {¶ 40} We agree with the parties that the evidence is insufficient to support appellant's conviction on the criminal gang specification. Accordingly, we sustain appellant's fourth assignment of error.
 {¶ 41} For all of the foregoing reasons, we overrule appellant's first, second, and third assignments of error and sustain his fourth assignment of error. We affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and we remand this case to that court with instructions to vacate appellant's conviction on the gang specification, and to conduct further proceedings consistent with law and with this opinion.
Judgment affirmed in part and reversed in part; cause remanded.
 McGRATH, P.J., and FRENCH, J., concur. *Page 1