JOURNAL ENTRY AND OPINION
{¶ 1} This case arises out of an April 14, 2006 drive-by shooting, which began after an altercation over a hat and resulted in the murder of Donta Dinkins and the shooting of Gregory Barnes. Defendant-appellant, R.G., appeals from a judgment of the Cuyahoga County Court of Common Pleas adjudicating him delinquent of murder, felonious assault, and obstructing justice. For the reasons that follow, we affirm in part, reverse in part, and remand.
 {¶ 2} In June 2006, a complaint was filed against R.G. in the Cuyahoga County Juvenile Court for one count of murder, in violation of R.C. 2903.02; one count of felonious assault, in violation of R.C. 2903.11(A)(1); two counts of felonious assault, in violation of R.C. 2903.11(A)(2); and two counts of obstructing justice, in violation of R.C. 2921.32(A)(2). Each count had a one-, three-, and five-year firearm specification, and a criminal gang activity specification. R.G. denied the allegations.
 {¶ 3} In September 2006, the Juvenile Court held a probable cause hearing to determine if R.G. was amenable to the juvenile justice system. The court held that he was and denied the state's request to proceed in the adult court. After the court's ruling, the state filed a notice of intent to seek an indictment against R.G. to add serious youthful offender specifications to each count. These specifications mandate that the case be bound over to the adult felony court. The case proceeded to a jury trial in the adult court. We have gleaned the following facts from the record adduced at trial. *Page 4 
 {¶ 4} Around 5:00 p.m. on April 14, 2006, Barnes, Dinkins, Dominic Perry, Bernie Burkhalter, and Dyrone Smith were standing outside Barnes's mother's house on East 151st Street, near Bartlett Avenue. While they were standing there, a white Cutlass Ciera drove by them. Antonio Anderson was driving the Cutlass and Robert Gordon was in the passenger seat. Gordon stuck his head out of the window and, according to Smith, "exchanged words with" Barnes. When Gordon stuck his head out of the window, his hat, which had "HVD" on it, fell into the middle of the street. Gordon yelled that he would be back for his hat. Barnes and Perry walked four or five houses down the street, where Gordon's hat had fallen, and stepped on the hat. After they stepped on it, they placed it in some bushes nearby. Barnes and some others walked toward the corner of "151st and Bartlett."
 {¶ 5} One witness, Burkhalter, stated that he saw a red Chevrolet Blazer during the initial exchange between Barnes and Gordon. He said it was "sitting midway down the street kind of like stopped," and he wondered why it was just sitting there. After the white Cutlass drove past that first time, he said the "red Blazer goes the opposite way like up Hamstead going towards like Lee Road." He said that he told Barnes to "chill, stay here." He did not want him to walk to the store "right then and right now."
 {¶ 6} A few minutes after Gordon had dropped his hat, the white Cutlass returned. Gordon was hanging out of the passenger window and began shooting. *Page 5 
When the white Cutlass turned the corner, it hit a gold car, and then hit a tree (or the tree lawn) and lost control, but Gordon continued to shoot at Barnes and the others.
 {¶ 7} Several witnesses, including Burkhalter, Smith, Perry and Danielle Winfield (Barnes's sister), saw the red Blazer stopped in the middle of the intersection at East 151st and Bartlett during the shooting. Smith said the red Blazer was "directly behind the white car in the middle of the street." Perry said the red Blazer arrived right before the white Cutlass hit the gold car. Perry further testified that when he and Dinkins took off running through a backyard, the red Blazer "went to 153rd to cut us off."
 {¶ 8} Burkhalter stated that "for a good 30 seconds while the shooting was going on," the red Blazer was "blocking traffic on 151st and Bartlett." Burkhalter said that he saw Barnes begin running "towards like Lee Road towards 153rd, then the Blazer takes off in the same direction that they take off." Burkhalter testified that he saw R.G. hanging his head out of the driver's side window of the red Blazer.
 {¶ 9} Barnes got shot in the cheek and Dinkins got shot in the neck. Dinkins died at the scene.
 {¶ 10} Barnes testified that Gordon and Anderson are "Harvard Boys." He explained that the Harvard Boys were a gang that "stays on Harvard." He did not know the names of all the gang members of the Harvard Boys because *Page 6 
"[t]here's so many of them *** from 131st to 189th." Barnes further explained that he was a "Bartlett Boy," and that the Harvard Boys and the Bartlett Boys "don't get along." Barnes did not consider the Bartlett group a gang, but said the police labeled them as that.
 {¶ 11} Perry explained that he was a Bartlett Boy. He said, "[w]e ain't nothing but guys that hang out together in the same neighborhood." He also said the Harvard Boys are "like the same." The two groups do not get along. The Harvard Boys hang out at Harvard Deli. Perry said that the Harvard Boys came into the Bartlett Boys' neighborhood before and shot at them.
 {¶ 12} Winfield testified that "[a]fter the shooting, the red truck had come up at the stop sign, stopped, a light-skin guy got out, grabbed the hat, got in the truck and pulled out." She explained that this was after the white car had fled the scene and said that was how she knew the red truck was connected to the white car, "because all of this was over a hat." She was able to view the license plate of the red truck and gave it to police.
 {¶ 13} Burkhalter testified that a few weeks after the shooting, R.G., his mother, and his sister approached him. R.G.'s mother asked him to tell her what happened that day, but he refused to talk to her. A couple of minutes later, R.G. approached him and said, "if I [had] a problem, `[w]e can take care of it right now or he'll kill me too.'" *Page 7 
 {¶ 14} Officer Richard Varndell of the Cleveland Police Department testified that he responded to a call of two males being shot. They also received information about the red Blazer being involved, the direction it had gone after the shooting, and its license plate number. Two to three minutes after the call, Officer Varndell and his partner stopped the red Blazer. It was a two-door Blazer, with no windows in the back. Its license plate matched the license plate given to police. There were five individuals in the truck: Andrew Dorsy was driving and Demario Golson was in the front passenger seat, Robert Gordon was sitting behind Dorsy, Antonio Anderson was sitting behind Golson, and R.G. was sitting in the back center seat, between Gordon and Anderson.
 {¶ 15} Officer Varndell had heard of the Harvard Boys, but knew them as the "Harvard Mob." He said that he "usually interacted with probably six of the regulars." He testified that they usually hang out in front of the Harvard Deli and sell marijuana. He also knew the Bartlett Boys as "BTO" or "Bartlett Taking Over."
 {¶ 16} Detective Michael Beaman testified that he interviewed R.G. at the police station the day of the shooting. He was 15 years old at the time. R.G. gave him a statement about the incident.
 {¶ 17} R.G. told Detective Beaman that DeMario Golson was in the vehicle with him and Dorsy "before the other guys got in the [Blazer]." R.G. said that *Page 8 
Gordon and Anderson got "in the Blazer with us just before the police stopped us. Like three minutes before we were pulled over."
 {¶ 18} R.G. denied knowing anything about a shooting at 151st and Bartlett. When asked to explain how he was picked up by the police, he stated:
 {¶ 19} "I was at my brother Jamel Golson's house, and I had been there all day. I don't know what time it was but my cousin DeMario [Golson] and Andrew [Dorsy] came to Jamel's house to pick me up and take me home.
 {¶ 20} "They were riding in a red Blazer, and Andrew [Dorsy] was driving, and DeMario [Golson] was in the front passenger seat. I got in the Blazer in the back seat, and we went down to my house.
 {¶ 21} "We sat in my driveway for like ten minutes. I got out and went up the street to talk to my friend. While I was talking to my friend, Andrew [Dorsy] called me and told me to come on, because they had to pick up Bobby [Gordon].
 {¶ 22} "We drove over on East 153rd [and] Edgewood, and I got out of the car, and started talking to my little cousin name Paul Smith Jr. who we call Pauly. While I was talking to Pauly I seen [Anderson] and Bobby [Gordon] sitting in a white car in front of my cousin Demario's [Goldson's] house. Demario lives on Edgewood.
 {¶ 23} "Then [Gordon] and [Anderson] pulled off, and we stayed on Edgewood about five minutes then we pulled off. Soon as we left Edgewood, they *Page 9 
called either my cousin Demario [Golson] or [Dorsy's] cell phone, and talked to [Dorsy]. While [Dorsy] was on the phone, I heard him asked `Where ya'll at?'
 {¶ 24} "After he hung up, [Dorsy] told me some people off Bartlett was shooting at [Gordon] and them, and they were at [Anderson's] aunt's house. We went on East 146th near Kinsman and picked [Gordon] and [Anderson] up.
 {¶ 25} "After we picked them up, we were driving across East 146th going towards my grandmother's house *** and the police *** pulled us over and arrested us. After the police arrested us, I found out the police found a gun in the car."
 {¶ 26} R.G. said that he had seen Gordon wearing the black HVD hat the day before the shooting. He said he saw it again "[w]hen they called and asked us to pick them up, we left Edgewood, turned right on East 151st [and] Bartlett. We turned in the store parking lot on the corner of East 151st and I seen [Gordon's] hat on the ground, and he said yeah. Demario [Golson] told [Dorsy] to stop so he could get it. Demario [Golson] got out and got [Gordon's] hat, and we drove on across to East 146th to pick them up."
 {¶ 27} Officer Ken Kirk said that when he arrived to assist other officers with the red Blazer, they already had all five suspects on the ground and handcuffed. It was his job to make sure that there were no weapons or other people in the vehicle and that is when he saw a "black pistol" sticking out of the *Page 10 
rear speaker well where Gordon had been sitting (behind the driver's seat). This gun was a Hi Point Model C nine-millimeter pistol.
 {¶ 28} Detective Harry Matlock, a lead detective on the case, explained that the suspects were apprehended seven to ten minutes after the shooting had been reported. He said that he and Detective James Raynard were the ones who actually searched the red Blazer at the impound lot. Prior to that, only the one gun in the speaker well had been found. But they found another gun in the red Blazer when they searched it, a Charter Arms .38 revolver (in the speaker well opposite the one where the gun was found).
 {¶ 29} Detective Matlock said that the black HVD hat that Gordon was wearing was found in the red SUV. He further explained that he seized sweat pants from one of the suspects (he never said who was wearing them) because someone had written Harvard Avenue on the pants.
 {¶ 30} Detective Matlock stated that he found an empty holster by Johnson's Deli. He also found ten-millimeter shell casings near a telephone pole at the intersection, but no gun. He said that none of the five suspects told the police that they had been shot at, or that they had been in a car accident.
 {¶ 31} Detective Matlock said that he went looking for Arnell Burkes because he owned the gold car that had been hit by the white Cutlass (the police had the license plate of the gold car because it had fallen off his car at impact). Arnell Burkes told the police that he was a victim of a drive-by shooting because *Page 11 
he had bullet holes in his car. Detective Matlock explained that Burkes was originally a possible co-defendant in this case, so he wasMirandized and notified that he may be charged with aggravated murder for the death of Donta Dinkins. Detective Matlock said that, although he was suspicious of Burkes, he did not "bring charges" against him because there was not enough evidence that he was involved. Burkes never made a police report or said he was shot at before the police found him. Detective Matlock agreed that Arnell Burkes told the police that someone was standing on the corner shooting. He agreed that Barnes was around the proximity of the telephone pole when the shooting occurred.
 {¶ 32} Detective Matlock also testified that there were no fingerprints found on either gun, and Gordon was the only one who tested positive for gun residue.
 {¶ 33} Sergeant Nathan Willson testified that he was assigned to the Cleveland Police Forensics Unit. He tested both guns that were found in the Blazer and both were operable. He stated "[t]hat to within a reasonable degree of scientific certainty" the bullet that was removed from Dinkins was fired from the "Hi-Point brand Model C nine-millimeter pistol." This is the gun that was found in the rear speaker well beside Gordon (behind the driver's seat).
 {¶ 34} He identified shell casings that had been found at the shooting scene; three spent nine-millimeter casings, four spent ten-millimeter casings and two miscellaneous spent rounds (they were not able to determine what kind they *Page 12 
were). The three spent nine-millimeter bullets came from the Hi Point Model C nine-millimeter pistol. The ten-millimeter casings all came from the same gun, but that gun was not found by the police. The other two spent rounds also came from the same firearm, but that gun was not recovered either.
 {¶ 35} At the close of the state's case, R.G. moved for a Crim. R. 29 acquittal, which the trial court denied.
 {¶ 36} The jury found R.G. delinquent of murder, with a one-year firearm specification and a criminal gang activity specification; delinquent of three counts of felonious assault, with one-year firearm specifications and a criminal gang activity specification; and delinquent of two counts of obstructing justice with one-year firearm specifications. It found him not delinquent of all of the three-and five-year firearm specifications and not delinquent of all of the serious youthful offender specifications.
 {¶ 37} The trial court ordered that R.G. be committed to the legal custody of the Ohio Department of Youth Services until he reached the age of 21. It is from this judgment that R.G. appeals, raising eight assignments of error for our review:
 {¶ 38} "[1.] Appellant's adjudications for felonious assault and murder are not supported by sufficient evidence where the state of Ohio failed to prove that the [sic] he participated in any manner whatsoever in the incidents. *Page 13 
 {¶ 39} "[2.] The appellant's adjudications for felonious assault and murder are against the manifest weight of the evidence.
 {¶ 40} "[3.] Mr. R.G.'s adjudications of delinquent as to the criminal gang activity specifications are not supported by sufficient evidence.
 {¶ 41} "[4.] The appellant's adjudications of delinquent as to the criminal gang activity specifications are against the manifest weight of the evidence.
 {¶ 42} "[5.] Appellant's adjudications for the gun specifications are not supported by sufficient evidence where the state failed to present evidence that the appellant shared the same mens rea as the principle offender.
 {¶ 43} "[6.] Trial counsel was ineffective for failing to cross-examine one of the state's key witnesses about two pending felony indictments.
 {¶ 44} "[7.] There was a structural error in the appellant's trial when he was not present at all critical times in the proceedings.
 {¶ 45} "[8.] The trial court erred in not ordering the state to provide the defense with full discovery."
 Sufficiency/Manifest Weight: Murder and FeloniousAssault {¶ 46} In his first assignment of error, R.G. argues that his delinquency adjudications for murder and felonious assault were not supported by sufficient evidence. In his second assignment of error he maintains that his adjudications for murder and felonious assault were against the manifest weight of the *Page 14 
evidence. Though sufficiency and manifest weight summon us to apply two different standards of review, we will discuss them together because both call for a detailed review of the evidence and because R.G. advances virtually the same arguments in support of each.
 {¶ 47} An appellate court's function in reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.Jenks at 273.
 {¶ 48} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion. Thompkins, supra, at 390. When a defendant asserts that a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the *Page 15 
fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. at 387.
 {¶ 49} R.G. argues that the evidence was insufficient and that his delinquency adjudications were against the manifest weight of the evidence because the state failed to present any evidence that he was a "willing and active participant in the shootings." R.G. maintains that the state's evidence that he was a "rear passenger in a car that was near the scene of the shootings," was not sufficient to show that he aided and abetted the principal offenders.
 {¶ 50} R.C. 2903.02(A) defines murder as "[n]o person shall purposely cause the death of another."
 {¶ 51} Felonious assault is defined by R.C. 2903.11(A), which states that "[n]o person shall knowingly: (1) Cause serious physical harm to another ***; [or] (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 52} R.C. 2923.03 sets forth the elements of complicity as follows: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: (1) Solicit or procure another to commit the offense; [or] (2) Aid or abet another in committing the offense[.]"
 {¶ 53} The Ohio Supreme Court has held that "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." State v.Johnson (2001), 93 Ohio St.3d 240, *Page 16 
243, citing State v. Widner (1982), 69 Ohio St. 2d 267, 269. "This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission."Johnson at 243.
 {¶ 54} To support a conviction based upon aiding and abetting pursuant to R.C. 2923.03(A)(2), "`the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' Such criminal intent can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed." In re T.K.,109 Ohio St.3d 512, 514, 2006-Ohio-3056, _13, citing Johnson, supra. Aiding and abetting may be shown by both direct and circumstantial evidence.State v. Cartellone (1981), 3 Ohio App.3d 145, 150.
 {¶ 55} The evidence, when viewed in a light most favorable to the prosecution, demonstrates that R.G. was not "merely present" in the back seat of the SUV. The evidence, if believed, shows that R.G. was present during the initial exchange between Barnes and Gordon. Burkhalter testified that he saw the red Blazer "like sitting midway down the street kind of like stopped" and he wondered why they were just sitting there. As the white Cutlass drove past, Burkhalter stated that the "red Blazer [went] the opposite way like up Hampstead going towards like Lee Road." *Page 17 
 {¶ 56} When the white Cutlass returned a couple of minutes later and began shooting, several witnesses saw the red Blazer sitting in the middle of the road behind the white Cutlass. Burkhalter testified that the red Blazer was "blocking traffic on 151st and Bartlett" and that he saw R.G. hanging out of the driver's side window of the red Blazer during the shootings.
 {¶ 57} Winfield testified that right after the shootings, and after the white Cutlass had fled the scene, the red Blazer pulled up and a man (who R.G. identified in his written statement as Demario Golson) got out of it and picked up Gordon's HVD hat. She wrote down the license plate number and gave it to the police. The police located the red Blazer within minutes of the initial call.
 {¶ 58} In his written statement the police, R.G. himself stated that he was in the red Blazer with Dorsy and Golson prior to picking up Gordan and Anderson.
 {¶ 59} In addition, the state also presented the testimony of nine police officers, detectives, and forensic examiners. Their testimony showed that within seven to ten minutes of receiving reports that shots had been fired near 151st Street and Bartlett Avenue, they had obtained the license plate of the red Blazer and apprehended it. As it turned out, the principal offender, Gordon, was sitting in the back seat of the Blazer beside R.G. Anderson, who had been driving the white Cutlass was sitting on the other side of R.G. The bullet that had killed *Page 18 
Dinkins was fired from a gun that was found in a speaker well beside Gordon in the back of the Blazer.
 {¶ 60} Construing the testimony in a light most favorable to the State, as we are required to do, it is clear there was sufficient evidence which, if believed, demonstrates that R.G. aided and abetted the principal offenders in the acts of murder and felonious assault. Although there were some inconsistencies in some of the witness's testimony at trial versus what they testified to at the probable cause hearing, aptly pointed out by defense counsel during cross-examination, "such inconsistencies do not render a *** conviction against the manifest weight or sufficiency of the evidence." State v. Nivens (May 28, 1996), 10th Dist. No. 95AP09-1236.
 {¶ 61} Upon review of all the evidence, and according due deference to the jury's credibility determinations and resolution of factual inconsistencies in the testimony, we conclude that a rational jury could have reasonably concluded that R.G. is delinquent beyond a reasonable doubt of murder and felonious assault. Thus, R.G.'s delinquency adjudications were based upon sufficient evidence and were not against the manifest weight of the evidence.
 {¶ 62} R.G.'s first and second assignments of error are overruled.
 Sufficiency of the Evidence: Criminal Gang Activity Specifications *Page 19 {¶ 63} In his third assignment of error, R.G. argues that the state did not present sufficient evidence to find him delinquent of the criminal gang activity specifications under R.C. 2941.142. He maintains that there "was no evidence whatsoever presented regarding [his] association with the so-called Harvard Boys or whether he had knowledge of [any] criminal activity associated with the Harvard Boys." He further contends that the evidence did not even show that the Harvard Boys "engaged in a pattern of criminal conduct."
 {¶ 64} R.C. 2941.142 ("Specification that an offender participated in a criminal gang") states in pertinent part:
 {¶ 65} "(A) Imposition of a mandatory prison term of one, two, or three years pursuant to division (I) of section 2929.14[1] of the Revised Code upon an offender who committed a felony that is an offense of violence while participating in a criminal gang is precluded unless the indictment, count in the indictment, or information charging the felony specifies that the offender committed the felony that is an offense of violence while participating in a criminal gang."
 {¶ 66} R.C. 2923.41(A) defines "criminal gang" as "an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply: *Page 20 
 {¶ 67} "(1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.
 {¶ 68} "(2) It has a common name or one or more common, identifying signs, symbols, or colors.
 {¶ 69} "(3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity."
 {¶ 70} Lastly, pursuant to R.C. 2923.41(A)(3), in order to meet the definition of a "criminal gang," the group of at least three individuals must engage in, or have engaged in, a "pattern of criminal gang activity." According to R.C. 2923.41(B) (1), a "pattern of criminal gang activity" arises when the persons in the gang have committed two or more of any of the offenses set forth in that division. The offenses include a felony or offense of violence, a felony or offense of violence committed by a juvenile that would be a felony or offense of violence if committed by an adult, and several enumerated violations of R.C. Chapter 29.
 {¶ 71} Further, four additional criteria must apply with respect to the offenses listed in division (B)(1) to establish "a pattern of criminal gang activity": at least one of the two or more offenses must be a felony; at least one of those two or more offenses must have occurred on or after January 1, 1999; the last of those two or more offenses must have occurred within five years after at least *Page 21 
one of those offenses; and the two or more offenses must have been committed on separate occasions or by two or more persons. See R.C. 2923.41(B)(2).
 {¶ 72} There was evidence which, if construed most strongly in favor of the state, indicated that Robert Gordon and Antonio Anderson were members of the Harvard Boys, and that there were a least six "regulars" in the gang. There was also evidence that Gordon was wearing the HVD hat, which stood for "Harvard" and was a symbol of the Harvard Boys. The police confiscated sweats from one of the five individuals in the red Blazer with "Harvard" handwritten down the side of the sweats. Several witnesses testified that the drive-by shooting was the result of an altercation between the Harvard Boys and the Bartlett Boys over the HVD hat. There was evidence that the Harvard Boys got their name because they "hung out" on Harvard Avenue, particularly at the Harvard Deli. Officer Varndell testified that the Harvard Boys often loiter and sell marijuana outside of the Harvard Deli.
 {¶ 73} Although there was no testimony that R.G. was a member of the Harvard Boys, he was apprehended by the police in the red Blazer with Gordon and Anderson approximately five to ten minutes after the shooting occurred. And we have already determined that the evidence was sufficient to show that R.G. was an accomplice to murder and felonious assault committed by the principal offender, who was a member of the Harvard Boys. An accomplice to a crime is subject to the same prosecution and punishment, including sentencing *Page 22 
enhancements, as the principal offender. See State v. Chapman (1986),21 Ohio St.3d 41, syllabus; State v. Moore (1985), 16 Ohio St.3d 30, 33
(holding that unarmed accomplice to aggravated robbery is subject to a mandatory three-year term of actual incarceration on a firearm specification).
 {¶ 74} Thus, the evidence was sufficient to prove that the Harvard Boys were an association with three or more members, had a common name, identifying signs and symbols, and sold marijuana as "one of its primary activities." These facts were adequate to satisfy the first two prongs of the definition of "criminal gang." When it comes to the third prong, however, we agree with R.G. that the state did not present sufficient evidence to prove that the Harvard Boys "engaged in a pattern of criminal gang activity."
 {¶ 75} In State v. Johnson, 10th Dist. No. 07AP-538, 2008-Ohio-590, a detective, who was "an expert in the field of gang identification," testified that the gangs in that case, the Bloods and Crips, were mortal enemies. The detective further testified "generally that gangs commit various crimes," but "did not testify as to any of the individuals involved in the *** case." The Tenth District stated that the detective "did not offer testimony that any members of the `Bloods' committed any of the crimes listed in (B)(2)." The Tenth District concluded that the evidence was not sufficient to show that the "Bloods" engaged in a pattern of criminal activity. Id. at _39. *Page 23 
 {¶ 76} We find the facts in this case similar to the facts presented in Johnson. Although Officer Varndell testified that the Harvard Boys loiter in front of the Harvard Deli and sell marijuana, there was no testimony from Officer Varndell or anyone else, that "persons in the criminal gang" committed two or more of the offenses listed in R.C. 2923.41(B)(1) or that any such crimes met the additional criteria set forth in R.C. 2923.41(B)(2) (at least one of the two or more offenses must be a felony; at least one of those two or more offenses must have occurred on or after January 1, 1999; the last of those two or more offenses must have occurred within five years after at least one of those offenses; and the two or more offenses must have been committed on separate occasions or by two or more persons). Thus, the evidence was not sufficient to prove that the Harvard Boys engaged in a pattern of criminal activity. R.G.'s delinquency adjudications for the criminal gang specifications are vacated.
 {¶ 77} Accordingly, R.G.'s third assignment of error has merit.
 {¶ 78} His fourth assignment of error, that his delinquency adjudication on the criminal gang specifications was against the manifest weight of the evidence, has been rendered moot by our disposition of the third assignment.
 Sufficiency of the Evidence: Firearm Specifications {¶ 79} In his fifth assignment of error, R.G. argues that his delinquency adjudications for the firearm specifications were not supported by sufficient *Page 24 
evidence because the state failed to prove that he shared the same mens rea as the principal offender. We disagree.
 {¶ 80} To support a conviction for a one-year mandatory firearm specification, the state must prove beyond a reasonable doubt that the "offender had a firearm on or about the offender's person or under the offender's control while committing the offense." R.C. 2941.141.
 {¶ 81} Criminal intent may be inferred from the presence, companionship and conduct before and after the offense is committed.State v. Pruett (1971), 28 Ohio App.2d 29, 34; Johnson, supra, at 245-246. Moreover, an accomplice can be subject to the mandatory sentencing enhancement of a firearm specification, regardless if he or she was the principal offender having the firearm on or about his or her person. Chapman, supra, syllabus (holding that an individual indicted for and convicted of aggravated robbery, and R.C. 2941.141, a firearm specification, is subject to a mandatory three-year term of actual incarceration under R.C. 2929.71, regardless of whether he was the principal offender or an unarmed accomplice).
 {¶ 82} Here, we have thoroughly reviewed the evidence presented. As we stated, the record clearly demonstrates that R.G. was not merely present at the scene. Rather, the testimony of the witnesses establishes that R.G. "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of *Page 25 
the principal." The state presented sufficient evidence that Gordon, the principal offender, had a firearm on or about his person. Accordingly, R.G., as Gordon's accomplice, is also subject to the firearm specification even though he was not the principal offender.
 {¶ 83} Accordingly, R.G.'s fifth assignment of error is overruled.
 Ineffective Assistance of Counsel {¶ 84} In his sixth assignment of error, R.G. argues that his defense counsel was ineffective for failing to cross-examine one of the state's key witnesses about two pending felony indictments.
 {¶ 85} Defense counsel informed the trial court that Barnes had two felonious assault cases pending in the common pleas court and that Fifth Amendment privilege issues may arise during cross-examination. The prosecutor stated that Barnes could not be cross-examined about his pending cases because he had not been convicted or sentenced on them yet. Defense counsel replied, "[w]e are perfectly aware of that, your honor." R.G. now claims that his defense counsel's failure to cross-examine Barnes about his pending cases "demonstrates that counsel did not know the applicable law" and thus, was ineffective.
 {¶ 86} To establish a valid claim for ineffective assistance of counsel, an appellant must demonstrate that: (1) defense counsel's performance was so deficient that he or she was not functioning as the counsel guaranteed by the *Page 26 
Sixth Amendment; and (2) defense counsel's errors prejudiced the defendant, depriving him of a trial whose result is reliable.Strickland v. Washington (1984), 466 U.S. 668, 687; State v.Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus.
 {¶ 87} Under Evid. R. 609(A)(1), a witness other than the accused may be impeached by evidence that the witness has been convicted of a felony. Thus, Evid. R. 609 only applies to prior convictions — i.e., not current or pending charges. See, generally, State v. Brooks (1996),75 Ohio St.3d 148, 151.
 {¶ 88} There is a limited "self-interest" exception where cross-examination of a pending case is permitted.
 {¶ 89} In State v. Hector (1969), 19 Ohio St.2d 167, the Ohio Supreme Court stated:
 {¶ 90} "While ordinarily the credibility of a witness may be attacked by proof of conviction of crime, but not by proof of indictment, this rule is subject to the exception that a witness in a criminal case may be asked if he is under indictment for crime, if such fact would reasonably tend to show that his testimony might be influenced by interest, bias, or a motive to testify falsely.
 {¶ 91} "*** [E]vidence that criminal charges are then pending in the same court against a witness for the prosecution is a circumstance tending to show that the testimony of the witness is or may be influenced by the expectation or hope that, by aiding in the conviction of the defendant, he might be granted *Page 27 
immunity or rewarded by leniency in the disposition of his own case." (Internal citations omitted.) Id. at 178-179.
 {¶ 92} Here, Barnes's felony cases were pending in the same court and thus, the limited "self-interest" exception could apply. However, R.G. does not show how the outcome of his trial would have been different had his defense counsel cross-examined Barnes about the pending felony charges and demonstrated bias or motive. Even if Barnes had not testified at all, there were three other witnesses — besides Barnes — who testified as to what happened that day (Perry, Burkhalter, and Smith). The testimony of all four witnesses, including Barnes, was nearly identical as to what happened. In addition, there was ample other evidence, including physical evidence and other witnesses, to adjudicate R.G. delinquent of the charges.
 {¶ 93} Accordingly, R.G.'s sixth assignment of error is overruled.
 Right to be Present at all Critical Stages of Trial {¶ 94} In his seventh assignment of error, R.G. argues that because he was not in the courtroom when his defense counsel orally raised and argued a motion in limine to exclude autopsy photos, it was structural error because it violated his "absolute constitutional right under the Fifth and Fourteenth Amendments *** to be present during this stage of his trial." *Page 28 
 {¶ 95} An accused has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim. R. 43(A). An accused's absence, however, does not result in prejudicial or constitutional error unless "a fair and just hearing would be thwarted by [defendant's] absence." Snyder v.Massachusetts (1934), 291 U.S. 97, 107-108. In United States v.Gagnon (1985), 470 U.S. 522, 527, the Supreme Court held that, in certain circumstances, a defendant's absence from a discussion at which his counsel are present does not offend due process. See, also, e.g.,State v. Williams (1983), 6 Ohio St.3d 281, 285-286 (defendant's absence from in camera voir dire of allegedly tainted jurors was harmless error).
 {¶ 96} R.G.'s defense counsel waived "his presence for this hearing." R.G. claims that the waiver does not apply because he did not personally waive his right to be present on the record, and the trial court did not find that such waiver was knowingly and intelligently made. However, the trial court was not required to conduct a colloquy on the record to establish a knowing waiver of R.G.'s right to be present. See State v.Davis, 116 Ohio St.3d 404, 2008-Ohio-2, _92, citing United States v.Riddle (C.A.6, 2001), 249 F.3d 529, 534.
 {¶ 97} Moreover, even if his counsel had not waived his right to be present at the motion in limine hearing, we have thoroughly reviewed the record in this case and conclude that R.G. was present at every critical stage in his trial. It is well-settled under Ohio law that the initial ruling of the trial court on a motion *Page 29 
in limine does not determine the ultimate admissibility of the evidence.State v. Armstrong, 11th Dist. Nos. 2001-T-0120 and 2002-T-0071,2004-Ohio-5635, _43; State v. Grubb (1986), 28 Ohio St.3d 199, 201. R.G. was present at the critical point when the trial court, over the renewed objection his defense counsel, admitted the autopsy photos.
 {¶ 98} Accordingly, we find no error, let alone structural error. R.G.'s seventh assignment of error is overruled.
 Juv. R. 24(B) Discovery {¶ 99} In his eighth assignment of error, R.G. argues that the trial court erred by not ordering the state to produce discovery under Juv. R. 24(B).
 {¶ 100} Juv. R. 24 (A) provides that "[u]pon written request, each party of whom discovery is requested shall, to the extent not privileged, produce promptly for inspection, copying, or photographing the following information, documents, and material in that party's custody, control, or possession: (1) The names and last known addresses of each witness to the occurrence that forms the basis of the charge or defense; (2) Copies of any written statements made by any party or witness[.]"
 {¶ 101} Juv. R. 24(B) states in part that "[i]f a request for discovery is refused, application may be made to the court for a written order granting the discovery. Motions for discovery shall certify that a request for discovery has been made and refused." *Page 30 
 {¶ 102} Under Juv. R. 24(C), "if at any time during the course of the proceedings it is brought to the attention of the court that a person has failed to comply with an order issued pursuant to this rule, the court may grant a continuance, prohibit the person from introducing in evidence the material not disclosed, or enter such other order as it deems just under the circumstances."
 {¶ 103} R.G. contends that the trial court erred when it concluded that "statements memorialized by the state were work product of the prosecutor" and then when it failed "to order the production of the summaries."
 {¶ 104} At the outset, we disagree with R.G.'s characterization of what occurred during the trial. First, the trial court never determined that "statements memorialized by the state" were work product, since there were no statements memorialized. Second, the trial court could not have failed to order the production of the summaries because again, there were no summaries.
 {¶ 105} What actually occurred was that immediately prior to the state questioning one its witnesses, Danielle Winfield, defense counsel objected to her testifying. Defense counsel stated:
 {¶ 106} "Your honor, I'm going to object to this witness. Juvenile Rule 24 clearly puts an affirmative obligation on the State to disclose to us all the information that is material to our client's guilt or innocence.
 {¶ 107} "The state has made no effort to do so, this witness and what she's going to say is a complete surprise to us, it is materially unfair and outside *Page 31 
of the rules and I object to any and all testimony that this witness is going to give."
 {¶ 108} The state responded that when it provided discovery to defense counsel (eight months before trial), the witness's first name, telephone number, and address were on the witness list. The trial court reviewed the witness list provided to defense counsel and verified that the information was on the list.
 {¶ 109} Defense counsel agreed that it had received the information, but argued that it was "not enough," because the state did not "provide the evidence as well."
 {¶ 110} The state then explained, "I just spoke to her ten minutes ago in the hallway and she told me what she [had] seen that day, there was never a statement taken from her." The trial court then overruled R.G.'s objection to Winfield testifying.
 {¶ 111} We find no error on the part of the trial court. Although it would have been prudent for the state to interview Winfield prior to "ten minutes" before trial, it did not do so. Nothing in the record indicates that the state's actions amounted to a willful discovery violation.
 {¶ 112} In addition, R.G. had notice that Winfield would be a witness eight months before trial. While this does not satisfy the requirement of a written summary, it did provide him with the opportunity to prepare his defense. *Page 32 
 {¶ 113} Finally, the record does not show prejudice. Winfield testfied that she saw the red Blazer at the intersection during the shootings. But several other witnesses also testified to that. Winfield also stated that she saw someone in the red truck get out of the truck and pick up Gordon's HVD hat. But R.G., in his written statement, said that while he was in the red Blazer, he saw Gordon's hat in the bush and that Golson got out of the truck and grabbed the hat. And finally, Winfield identified the license plate number that she had given the police, but that evidence was also in the record from the officers' testimony. Thus, even if the trial court would have granted R.G.'s objection, it would not have changed the outcome at trial. Accordingly, R.G.'s eighth assignment of error is overruled.
 {¶ 114} In summary, R.G.'s first, second, fifth, six, seventh, and eighth assignments of error are overruled. His third assignment of error is sustained and as a result, his fourth assignment of error is moot. The judgment is affirmed in part, with respect to all delinquency adjudications and firearm specifications, but reversed in part with respect to the criminal gang specifications. R.G.'s delinquency adjudications for the criminal gang specifications are vacated. This case is remanded for further proceedings consistent with this opinion.
It is ordered that appellant and appellee split the costs herein taxed.
 The court finds there were reasonable grounds for this appeal. *Page 33 
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, A.J., and SEAN C. GALLAGHER, J., CONCUR
[1] R.C. 2929.14(I) provides: "If an offender who is convicted of or pleads guilty to a felony that is an offense of violence also is convicted of or pleads guilty to a specification of the type described in section 2941.142 of the Revised Code that charges the offender with having committed the felony while participating in a criminal gang, the court shall impose upon the offender an additional prison term of one, two, or three years." *Page 1