The STATE of Ohio, Appellee,

v.

MARZETT, Appellant.

[Cite as State v. Marzett, 191 Ohio App.3d 181, 2010-Ohio-5428.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 93805.

Decided Nov. 8, 2010.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, for appellee.

Craig T. Weintraub, for appellant.

ON RECONSIDERATION [1]

CHRISTINE T. McMONAGLE, Presiding Judge.

{¶ 1} Defendant, Lawrence Marzett, appeals from his convictions for murder and felonious assault. For the reasons set forth below, we reverse.

{¶ 2} On November 13, 2008, defendant was indicted for attempted murder and felonious assault in connection with an alleged attack on 58–year–old Robert Moore. Moore died on December 17, 2008, and defendant was later indicted pursuant to a three-count indictment. Count 1 charged him with murder in violation of R.C. 2903.02(A). Count 2 charged him with murder in violation of R.C. 2903.02(B), and Count 3 charged him with felonious assault. All counts also contained notice of a prior conviction for felonious assault and a repeat-violent-offender specification. Defendant pleaded not guilty to the charges.

{¶ 3} On June 24, 2009, defendant filed a motion for the appointment of a medical expert at the state's expense to examine Moore's medical records. Defendant asserted that there was a particularized need for the expert in order to determine whether Moore died due to blows sustained in the altercation or due to his past medical problems. The trial court denied this request. The court found defendant's claim of indigence to be of "questionable credibility," since defendant had retained counsel and since the motion was filed within three business days of trial. The court also determined that defendant had not demonstrated a particularized need for the expert and had instead offered mere speculation as to the need for this expert.

{¶ 4} Defendant waived his right to a jury trial on Counts 2 and 3 and the specifications and notice of prior conviction attendant to Count 1. The hybrid jury and bench trial commenced on June 29, 2009.

---

1. The original announcement of this decision, *State v. Marzett*, Cuyahoga App. No. 93805, 2010-Ohio-4348, 2010 WL 3584057, released September 16, 2010, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. See App.R. 22(E); see also S.Ct.Prac.R. 2.2(A)(1).

{¶ 5} The state's evidence demonstrated that at around noon on October 23, 2008, Moore was walking on Euclid Avenue. Video surveillance from the Noble Drive Thru shows that Moore was approached by Kent Fletcher, who was with defendant. The video further shows that defendant and Moore had a verbal exchange and Moore then began to walk away.

{¶ 6} The defendant then swung at Moore and punched him in the face. Moore, a former boxer, assumed a defensive stance, and he and defendant fought. The fight continued for several minutes, and as it proceeded, defendant took off his shirt. He struck Moore several times in the face, then pinned him. Defendant subsequently got free of Moore and fled. Fletcher fled in a different direction. As shown on the video, Moore was not totally prone at the end of the fight. The video had several breaks, however, and according to the state's witnesses, the system stops recording when there is no motion.

{¶ 7} Jeff Polk and Rodney Starks, East Cleveland Emergency Medical Technicians ("EMTs"), arrived at the scene in response to a call that there was someone in the street who was having a seizure. They intubated Moore and administered epinephrine and shock treatments to restart his pulse. According to Polk, Moore remained unresponsive. The EMTs administered the Glascow Coma Scale to Moore to quantify his eye movements, motor skills, and verbal ability. Moore received a 3 on this test, the lowest possible score, which signified that Moore had irreversibly ceased all brain function.

{¶ 8} When the detectives located Fletcher, he was in possession of belongings discarded during the defendant's fight with Moore. Fletcher identified defendant as the person involved in the fight with Moore. Fletcher made a statement to police and also testified at trial. According to the statement, Moore approached him while he was with defendant and asked about drugs.[2] Defendant started to say something to Moore, but Moore became angry and told defendant that the matter was none of his business. Defendant then became upset and sucker punched Moore in the face. Defendant and Moore began to fight. Fletcher broke up the fight and continued to speak with Moore. Defendant complained that his lip was hurt and attacked Moore again. Defendant then choked Moore. Moore fell to the ground and defendant continued to strike him. Fletcher attempted to break up the fight but was unable to do so. After several minutes of beating Moore, defendant fled toward Noble Road. According to the oral statement, Fletcher did not know that Moore was badly hurt.

{¶ 9} Fletcher testified that he ran into defendant on his way to the Noble Road Drive Thru. Moore approached, and Fletcher tried to show him some-

---

2. Fletcher sometimes referred to Moore and defendant by their alleged nicknames of "Old School" and "Black" respectively.

thing.[3] Defendant told Fletcher to go. Moore told defendant to "shut the f* * * up," and defendant then punched Moore in the face. Moore fought back and split defendant's lip. Fletcher and Moore walked around the corner. The fight continued. Defendant then fled, and Fletcher picked up defendant's hat, jacket, and glasses, which were left behind.

{¶ 10} Patrolman John Donitzen testified that he arrested defendant and that defendant repeatedly stated that Moore had started the altercation and that he was afraid of Moore. Defendant additionally stated that after the fight had ended, Moore walked away.

{¶ 11} Moore was taken to Huron Road Hospital. He was comatose and was later transported, via Life Flight, to the Cleveland Clinic. His relatives made medical decisions on his behalf. Moore was later transferred to the Hospice of the Western Reserve, where he died several weeks later.

{¶ 12} Deputy Coroner Dan Galita testified that he performed an autopsy on Moore. Dr. Galita observed a healing injury laceration to the back of Moore's head, which demonstrated that Moore had sustained blunt force trauma to the head one or two months before his death. In addition, Moore's tongue fell back and obstructed his airway immediately following the assault. This impaired Moore's airway and his brain could not receive oxygen. Dr. Galita also observed a healing fracture to the rib. Moore died due to "post-traumatic hypoxic ischemic brain damage due to blunt force trauma to the head with subsequent prolonged ventricular fibrillation arrest." According to Dr. Galita, Moore suffered a prolonged lack of oxygen to his brain due to head trauma and this rendered him irreversibly unconscious. The manner of death was homicide.

{¶ 13} Dr. Galita further explained that Moore had an enlarged heart due to heart disease, fluid in his lungs, 80 percent clogged arteries, and a seizure disorder. Dr. Galita testified that all of these conditions could have caused death, some at any time, but that they did not, however, in his opinion cause Moore's death. Moore also had cocaine in his system. According to Dr. Galita, cocaine can produce bleeding in the brain, but it does not cause deep coma followed by cardiac respiratory arrest. In addition, according to Dr. Galita, the results of the Glascow Coma Scale administered by the EMTs demonstrate that Moore had, after the assault, irreversibly ceased all brain function.

{¶ 14} Moore's daughter, Charese Krasacok, testified that her father never regained consciousness and that she and her sisters made medical decisions on his behalf. She admitted, however, that her father had preexisting heart problems and was a drug user.

---

3. Fletcher asserted his Fifth Amendment rights when asked for more specificity.

{¶ 15} Defendant elected to present evidence. He testified that Moore offended him by asking if he had something to smoke "dope" with. Defendant told him to get out of his face. Moore responded by informing defendant of his 15–to–20–year boxing career and that he would knock defendant out. Defendant felt Moore's words were threatening. Moore then "flinched" at him, causing him to believe that Moore was going to strike him, and defendant then struck Moore in the face. Moore then retaliated with a "four piece combination," meaning he hit defendant four times in the face. Defendant's mouth and nose began to bleed—he was spitting out blood. Defendant was upset. Moore said to defendant, "You're disabled now. I should have bust a cap in your a* *."

{¶ 16} Defendant then tapped Moore on the shoulder and asked if Moore was going to get a gun. Moore responded that he might, and then Moore hit defendant in the face. They continued to fight. Defendant denied choking Moore and testified that he did not try to kill him. Defendant fled when he heard someone say "call an ambulance. He having a seizure." Defendant said he ran away because he believed that Moore might really try to shoot him. At this time, Moore was sitting and looked like he still wanted to fight. According to defendant, Moore had a "good scowl on his face" like a "pit bull."

{¶ 17} Defendant denied following Moore and Fletcher around the corner to reinitiate the fight. He claimed he was instead trying to make sure that Moore did not get a gun. Defendant said that he was trying to get away from the situation. He claimed that Moore resumed the fight. Defendant could not recall how many times he had punched Moore because he was in a rage.

{¶ 18} The jurors presented a series of questions for defendant to answer, including what medication he was prescribed on the date the fight occurred, whether he hit Moore with anything other than his fist, whether he slammed Moore's head on the ground, and whether defendant felt he ever had any leverage over Moore in the fight. Defendant denied using anything besides his fist and said that he did not slam Moore's head on the ground and that he felt the fight was even.

{¶ 19} The jury acquitted defendant of murder as alleged in Count 1, as well as the inferior degree and lesser included offenses of voluntary manslaughter and reckless homicide. The court found defendant guilty of murder as alleged in Count 2 and felonious assault as alleged in Count 3. Thereafter, the trial court sentenced defendant to a term of life imprisonment, with parole eligibility after 15 years for the murder conviction, and a concurrent eight-year term for the felonious-assault conviction. A three-year term of postrelease control was also included in the sentence for felonious assault. Defendant has appealed and has assigned five errors for our review.

{¶ 20} In his first assignment of error, defendant contends a violation of his constitutional rights occurred when the trial court spoke with the jurors after they finished deliberating on Count 1, before the trial court determined guilt or innocence on Counts 2 and 3 and the relevant specifications. Appellant seeks a new trial as to Counts 2 and 3 of the indictment due to the trial court's unrecorded discussions with the jury, which occurred outside of his presence.

{¶ 21} Appellant requested, the state acquiesced, and the trial court permitted the appellant to select which counts of his indictment he wished to try to the jury and which to the bench. Specifically, appellant offered a waiver of his right to jury trial on Counts 2 and 3, felony murder under R.C. 2903.02(B), and felonious assault, along with some specifications. However, he at the same time demanded a jury trial on Count 1, murder in violation of R.C. 2903.02(A).

{¶ 22} This case involves multiple counts of murder and felonious assault that arose out of the same nucleus of operative facts. Additionally, the appellant asserted self-defense, a defense that, if factually proved, would have entitled him to acquittal on all counts. Indeed, the trial court's comments following the jury's verdict recognized that this was one of the potential bases for the jury's not-guilty verdicts on murder, voluntary manslaughter, and reckless homicide. Notwithstanding the jury's verdict, the trial court found appellant guilty of both felony murder and felonious assault.

{¶ 23} We acknowledge that appellant, who ultimately invited this situation, has not raised or challenged it in this appeal. However, this peculiar procedural posture must be taken into consideration in examining the propriety of the discussions held between the trial court and the jury and outside of appellant's presence.

{¶ 24} An accused has a fundamental right to be present at all critical stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). *In re R.G.*, Cuyahoga App. No. 90389, 2008-Ohio-6469, 2008 WL 5182950.

{¶ 25} At issue here is the regularity of the trial court's deliberative process. We are guided by Crim.R. 33(A)(1), which allows for a new trial in criminal cases when there has been an irregularity in the proceedings. Without disputing that an irregularity occurred, the state contends that this assigned error lacks merit for two reasons: (1) defendant did not object and (2) there is no evidence that the discussions influenced the trial court's decision. Neither reason is sufficient in this case to overcome the merits of appellant's arguments in this regard.

{¶ 26} At least one court has held that an alleged irregularity in the deliberative process implicates a structural error that is not waived for failure of trial counsel to object and can be raised for the first time on appeal. E.g., *State v. Davis*, Clark App. No. 2002–CA–43, 2003-Ohio-4839, 2003 WL 22110297, ¶ 54–55

("It is a claim of structural error, since it challenges the regularity of the jury deliberation. Where structural error is found, prejudice is presumed; prejudice is not required to reverse a judgment tainted by structural error"). In the absence of structural error, plain-error analysis would apply. Crim.R. 52(B).

{¶ 27} As stated, the jury and bench trials proceeded simultaneously. Based on the evidence presented, the trial court instructed the jury on the affirmative defense of self-defense. While the jury retired to deliberate on Count 1 and the additional offenses of inferior and lesser degree, the trial court heard additional arguments from the parties on Counts 2 and 3. Again, the defense maintained that he acted in self-defense.

{¶ 28} The jury's not-guilty verdicts were announced in open court on July 6, 2009, after which the defense inquired:

{¶ 29} "They were instructed as to—if self-defense was the reason for their plea, I believe."

{¶ 30} The court responded: "Well, they found not guilty, there was no separate interrogatory on self-defense, so I'm not going to—I've got no means by which to ask what the reason is, but I would imagine, though, your client is satisfied with these verdicts. He probably doesn't want to question them too much, I would think."

{¶ 31} The court then discharged the jury and proceeded to deliberate on Counts 2 and 3 of the indictment. But prior to rendering its verdict, the court said,

{¶ 32} "Ordinarily * * * I converse with the jury in chambers after any case regardless of what the verdict is. Counts 2 and 3 are still pending before the Court.

{¶ 33} "Is there any objection to the Court having that conversation under these circumstances * * *?"

{¶ 34} The state believed that the court would "not be influenced by opinions of the jury" and had no objection. The defense likewise deferred to the court and did not object.

{¶ 35} The court, prior to conversing with the jurors and rendering its verdict, observed the following on the record: "The verdicts just rendered, it seems to me, are supportive in two possible ways. The first is that the jury believes the state did not meet its burden of proof beyond a reasonable doubt. The second, though, is it seems to me that the jury found that the defendant proved, by a preponderance of the evidence, the defense of self-defense." The state then proffered a third speculative basis for the jury's verdict.

{¶ 36} The court told appellant that it expected to have its verdict "relatively quickly" but was "not ready to rule at this point." The record reflects that court was adjourned, after which the court apparently had its contemplated conversation with the jury.

{¶ 37} The record resumes approximately two weeks later on July 16, 2009, when the trial court found appellant guilty of felony murder, felonious assault, and a repeat-violent-offender specification, finding that appellant had previously been convicted of felonious assault. In reaching this conclusion, the trial court reasoned that self-defense did not apply because it concluded that appellant started the fight. The court also found that the victim's death was the proximate result of appellant's commission of felonious assault.

{¶ 38} The communications between the trial court and the jurors during the court's deliberative process were not recorded. It can be gleaned from the record, however, that it was likely that the trial court would be engaging in substantive discussions with the jury about this case. Even the prosecutor's comments contemplated that the jurors' opinions would be discussed with the court.

{¶ 39} As previously noted, "[t]his court stands behind the position that a trial judge should refrain from any contact with a jury in the absence of proper representation by both parties." *State v. White* (1989), 65 Ohio App.3d 564, 584 N.E.2d 1255, citing *State v. Maynard* (1987), 38 Ohio App.3d 50, 53, 526 N.E.2d 316.

{¶ 40} In "very limited circumstances, reviewing courts have found a trial court's *ex parte* communication on peripheral matters with a jury to be harmless. See *Rushen v. Spain* (1983), 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267." *Sweet v. Clare–Mar Camp, Inc.* (1987), 38 Ohio App.3d 6, 526 N.E.2d 74. Because the discussions at issue were not recorded, we have no way of knowing what matters, peripheral or otherwise, that the court and the jury actually discussed. Id. ("In view of a silent record we are unable to determine the propriety of the court's words to the jury * * * ").

{¶ 41} Although the existing case law that prohibits ex parte communications between the judge and jury pertains to matters being deliberated by a jury, this is a distinction without a difference. The law provides for either a trial by a jury of 12 or a bench trial in which the judge acts solely as the finder of fact. There is no provision that would allow any collaboration between a trial court judge, who is acting as the fact-finder, and a jury of 12 in reaching a verdict.

{¶ 42} We hold that the trial court's conversations with the jury outside the presence of the defense and while still deliberating its verdict on pending charges

is an unsupportable irregularity in the proceedings that merits reversal. Accord, *Sweet,* 38 Ohio App.3d 6, 526 N.E.2d 74.

{¶ 43} Accordingly, this assignment of error is sustained, defendant's convictions are reversed, and the matter is remanded for further proceedings as to Counts 2 and 3 of the indictment.

{¶ 44} Our resolution of the first assignment of error renders the remaining errors moot and we make no determination as to the potential merits of them.

Judgment reversed
and cause remanded.

JONES, J., concurs.

DYKE, J., dissents.