[Cite as *In re T.W.*, 2012-Ohio-2361.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

**IN THE MATTER OF:**

**T.W.,**                                         **CASE NO. 9-10-63**

**ALLEGED DELINQUENT CHILD,**

    **[STATE OF OHIO,**                           **O P I N I O N**
    **APPELLANT].**

**Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 10 DL 633**

**Judgment Affirmed**

**Date of Decision:   May 29, 2012**

**APPEARANCES:**

    *Brent W. Yager and Megan K. Frericks*  **for Appellant**

    *Raymond A. Grogan, Jr.*  **for Appellee**

Case No. 9-10-63

**ROGERS, J.**

{¶1} Plaintiff–Appellant, State of Ohio, appeals from the judgment of the Court of Common Pleas of Marion County, Family Division, granting Defendant-Appellee's, T.W., motion to suppress. On appeal, the State contends that the trial court erred and abused its discretion in granting T.W.'s motion to suppress. Based on the following, we affirm the judgment of the trial court.

{¶2} In July 2010, a complaint was filed against T.W. charging him with a single count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree if committed by an adult. The complaint arose as a result of an allegation against and subsequent admission by T.W. that he had inappropriate sexual contact with his four-year-old half-sister, C.W.

{¶3} On September 27, 2010, T.W. filed a motion to suppress his interview and written statement made at Marion County Children Services ("Children Services") on April 5, 2010. T.W. argued that he was in custody during the interview, but was not administered *Miranda* warnings.

{¶4} On November 17, 2010, the matter proceeded to a suppression hearing. Prior to hearing testimony, the parties stipulated that T.W. was fourteen-years-old during the interview, and that T.W. had no prior involvement with law enforcement. The following facts and testimony were subsequently adduced.

-2-

{¶5} Brandy Page ("Page") testified that in April 2010, she was employed with Children Services as an intake investigator. In February 2010, Children Services received an allegation that T.W. had "inappropriately" touched C.W.'s genital region. In response to the allegation, Page contacted T.W.'s mother, Michelle Shimp ("Shimp"), via telephone. During her conversation with Shimp, Page advised her of the allegation against T.W., that Children Services would be conducting a full investigation of the allegation, the possible charges T.W. may face if the allegation was substantiated, and scheduled T.W. for an interview at Children Services.

{¶6} On April 5, 2010, Shimp and T.W.'s step-father drove T.W. to Children Services for the interview. Page met with T.W. and his parents in the lobby, where she advised T.W.'s parents that the agency preferred to interview children alone, but that the parents may accompany T.W. in the interview or watch the interview in an adjacent conference room, via a live video feed. Page testified that T.W. was present when she advised T.W.'s parents that they could accompany him in the interview, but that she did not communicate the same directly to T.W. Page continued that she gave T.W.'s parents a "consumer brochure" that explained their rights, and that Shimp signed a paper memorializing receipt of the brochure.

{¶7} Thereafter, Page and Officer Timothy Rowe ("Officer Rowe"), of the Marion Police Department, escorted T.W. to the interview room. According to Page and Officer Rowe, the interview room was small and could accommodate approximately three to four people. The interview room had two doors; one door opened into an interior hallway, the second door opened into an adjoining conference room.[1] The interview room contained video and audio equipment, a table, and several chairs. After Officer Rowe, Page, and T.W. entered the interview room the door was closed. Although the record does not reveal the exact seating arrangement, it does reveal that T.W. was seated facing Officer Rowe, and that either Officer Rowe or Page had their seat positioned near the door through which they entered the interview room.

{¶8} Page continued that she, Officer Rowe, and T.W. were the only individuals present in the interview room, and that she and Officer Rowe were present for the entire interview. The interview lasted approximately one hour. Page testified that T.W. was neither placed nor told that he was under arrest before, during, or after the interview; that she did not advise T.W. about the possible charges; and, that T.W. never asked for his parents to be present during the interview. Fifty-five minutes into the interview T.W. admitted that he

---

[1] There is no evidence that T.W. was aware that the second door opened into a conference room.

inappropriately touched C.W. After T.W. gave a written statement of his admission he left Children Services with his parents.

{¶9} Officer Rowe testified that he is employed as a police officer with the Marion Police Department, and that he has held that position for twenty-one years. Officer Rowe testified that he had conducted approximately a dozen juvenile interviews at Children Services, and received training in juvenile interview techniques.

{¶10} On the day of the interview, Officer Rowe wore his police uniform and firearm. Officer Rowe testified that, prior to the interview, he met with T.W. and his parents in the lobby, where he advised them that T.W. was not under arrest and that he was free to leave. Officer Rowe further testified that he never directly advised T.W., prior to or during the interview, that he could have his parents accompany him in the interview room or that he could have an attorney present, but did testify that T.W. was present when he informed T.W.'s parents that they could accompany T.W. in the interview room.

{¶11} The interview lasted approximately one hour. Officer Rowe testified that the interview's duration was average considering the allegation. Officer Rowe testified that T.W. appeared somewhat relaxed during the interview. Based

on his prior experience interviewing juveniles, Officer Rowe concluded that T.W. appeared to understand why he was at Children Services.

{¶12} Throughout the interview, Officer Rowe repeatedly asked T.W. whether he inappropriately touched C.W.'s genital region. In response, T.W. repeatedly denied the allegation. T.W. denied the allegation approximately fifteen (15) times before admitting that he inappropriately touched C.W.[2] Officer Rowe testified that he continued questioning T.W. despite the repeated denials because his experience and training lead him to believe that T.W. was not being truthful. Particularly, Officer Rowe testified that T.W. demonstrated signs of deception throughout the interview including, but not limited to, shifting his weight in the seat, pausing after questions, looking off to the side, and dry lips.

{¶13} Officer Rowe continued that T.W.'s freedom of movement was not restricted during the interview; that T.W. never asked to leave; that T.W. never asked to stop the interview; that T.W. never asked for his parents to be present during the interview; and, that T.W. was never told that he was under arrest. Officer Rowe advised T.W., at approximately eight minutes and twenty-seven minutes into the interview, that he was "not going to be arrested," and that he was "free to go, and [he is] not going to be arrested" that day, respectively.

---

[2] The number of denials is based on our independent review of the interview's audio recording.

Case No. 9-10-63

{¶14} At the conclusion of Officer Rowe's testimony the State moved to admit the audio recording of T.W.'s interview and written statement. T.W. did not object, and the exhibits were admitted. Subsequently, the State rested.

{¶15} Shimp testified that several days prior to the interview Page contacted her via telephone. During their conversation, Page advised her of the allegation against T.W., the possible charges T.W. may face if the allegation was substantiated, and scheduled T.W. for an interview at Children Services. On April 5, 2010, Shimp and T.W.'s step-father drove T.W. to Children Services for the interview. Upon arriving at Children Services, Shimp spoke with Page. Shimp testified that Page only advised her that she and Officer Rowe were going to interview T.W. Shimp also spoke with Officer Rowe before the interview, but could not recall the contents of that conversation. As Page and Officer Rowe escorted T.W. to the interview room, Shimp testified that she and T.W.'s step-father stood up to follow, but Officer Rowe advised them that they could not accompany them in the interview room. Shimp further testified that she and T.W.'s step-father were never presented with an opportunity to watch a live video feed of the interview.

{¶16} On December 1, 2010, the trial court filed its judgment entry granting T.W.'s motion to suppress, finding that T.W.'s interview was custodial in nature.

{¶17} It is from this judgment the State appeals, presenting the following assignment of error for our review.

### *Assignment of Error No. I*

**THE JUVENILE COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING APPELLEE'S MOTION TO SUPPRESS EVIDENCE.**

{¶18} In its sole assignment of error, the State contends that the trial court erred in granting T.W.'s motion to suppress his interview at Children Services. Specifically, the State contends that there was no need to administer *Miranda* warnings because T.W. was not in custody during the interview. We disagree.

{¶19} Initially, we note that the State also contends that T.W.'s inculpatory statements were made voluntarily, and were not the product of coercion. Upon review of the record, particularly T.W.'s motion to suppress, there is no discussion concerning the voluntary nature of T.W.'s statements. Additionally, the trial court's judgment entry does not address whether T.W.'s statements were voluntary or involuntary. Because this issue was not raised by either party below or addressed by the trial court we decline to address the issue at this time.

{¶20} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson*, 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of facts so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). The appellate court must then review the application of the law to the facts de novo. *Roberts*, citing *Burnside* at ¶ 8.

{¶21} The Fifth Amendment to the United States Constitution provides individuals with protection against self-incrimination. *See Chavez v. Martinez*, 538 U.S. 760, 123 S.Ct. 1994 (2003). "'Juveniles are entitled both to protection against compulsory self-incrimination under the Fifth Amendment and to *Miranda* warnings where applicable.'" *In re Forbess*, 3d Dist. No. 2-09-20, 2010-Ohio-2826, ¶ 27, citing *In re Gault*, 387 U.S. 1, 55, 87 S.Ct. 1428 (1967).

{¶22} "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to

questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602 (1966). "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444. Police are not required to administer *Miranda* warnings to everyone whom they question. *State v. Biros*, 78 Ohio St.3d 426, 440 (1997), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711 (1977). Rather, police are required to administer *Miranda* warnings where an individual is subject to "custodial interrogation." *Id*., citing *Mathiason* at 494.

{¶23} "In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner*, 102 Ohio St.3d 358, 362, 2004-Ohio-3430, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995). The first inquiry is distinctly factual. *Keohane* at 112. "Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry' of whether there was

a ''formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *Hoffner* at ¶ 27, citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517 (1983), quoting *Mathiason* at 495. The subjective views harbored by either the interrogating officers or the person being questioned are of no consequence in the *Miranda* analysis. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526 (1994). In resolving "the ultimate inquiry" courts must consider the totality of the circumstances surrounding the questioning. *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995); *Beheler* at 1125.

*Reconstruction of Facts*

{¶24} The facts of the present case are relatively undisputed. After receiving an allegation that T.W. had inappropriate sexual contact with C.W., Page, an intake investigator with Children Services, contacted T.W.'s mother, Shimp, to schedule T.W. for an interview at Children Services. During this conversation Shimp was informed of the possible charges T.W. could face if the allegation was substantiated and that Children Services would be conducting a full investigation into the allegation. On the day of the interview, Shimp and T.W.'s step-father drove T.W. to the interview at Children Services. At this time T.W. was fourteen-years-old and had no prior experience with law enforcement.

{¶25} Upon arriving at Children Services, Page and Officer Rowe, an officer with the Marion Police Department, met with Shimp, T.W.'s step-father, and T.W. in the lobby. Officer Rowe wore a police uniform and firearm throughout his encounter with T.W. Prior to the interview, Officer Rowe informed T.W. and his parents that they could accompany T.W. in the interview, that he was not under arrest, and that he was free to leave.

{¶26} After meeting in the lobby, T.W. was escorted by Officer Rowe and Page to the interview room. Shimp and T.W.'s step-father attempted to follow T.W. back to the interview room, but Officer Rowe advised them that they could *not* accompany them in the interview room. The interview room was small and could accommodate approximately three to four people. The interview room had two doors; one door opened into an interior hallway, the second door opened into an adjoining conference room. Upon entering the interview room T.W. took a seat facing Officer Rowe. Additionally, either Page or Officer Rowe was seated near the door through which they entered the interview room.

{¶27} Officer Rowe, Page, and T.W. were the only individuals present in the interview room, and were present throughout the entire interview. The interview lasted approximately one hour. T.W.'s admission, however, did not occur until fifty-five (55) minutes into the interview. Officer Rowe was the only

individual who asked T.W. questions during the interview. Based on his experience in conducting juvenile interviews, Officer Rowe testified that T.W. was somewhat relaxed and understood why he was at Children Services. At no time during the interview was T.W. advised that he was under arrest. Rather, T.W. was advised twice, at approximately eight minutes and twenty-seven minutes into the interview, that he was "not going to be arrested," and that he was "free to go, and [he is] not going to be arrested" that day, respectively. T.W. never asked to leave the interview or stop the interview. During the course of the interview, Officer Rowe repeatedly asked T.W. whether he inappropriately touched C.W.'s genital region. T.W. responded in the negative approximately fifteen (15) times before admitting that he inappropriately touched C.W. Upon obtaining a verbal confession, Officer Rowe requested T.W. to give a written statement of his admission. After T.W. completed the written statement he was released to Shimp and his step-father, who drove him home.

*Totality of the Circumstances*

{¶28} At the outset, we note that the instant case contains facts that both weigh in favor of and against a finding that T.W. was in custody. Upon considering all of the facts surrounding T.W.'s interview, we find that a

reasonable juvenile in T.W.'s position would not have felt free to terminate the interview and leave.

**{¶29}** We begin with a discussion of those facts that weigh in favor of a finding that T.W. was in custody. Recently, the United States Supreme Court held that a juvenile's age may be considered in the *Miranda* analysis, so long as the juvenile's age was known to the officer at the time of questioning or would have been objectively apparent to a reasonable officer. *J.D.B. v. North Carolina*, ___ U.S. ___, 131 S.Ct. 2394 (2011). The Supreme Court recognized that in the specific context of police questioning, events that "would leave a man cold and unimpressed can overawe and overwhelm a" teen. *Id.* at 2397, quoting *Haley v. Ohio,* 332 U.S. 596, 599, 68 S.Ct. 302 (1948). While a juvenile's age may be considered in the *Miranda* custody analysis, the Supreme Court cautioned that "this does not mean that a child's age will be a determinative, or even a significant, factor in every case * * *." *J.D.B.*, 131 S.Ct. 2394, syllabus. Bearing this in mind, at fourteen years of age, a reasonable juvenile in T.W.'s position would, in all likelihood, be intimidated and overwhelmed. There is no evidence that T.W. volunteered to go to Children Services. Rather, the evidence reveals that T.W.'s mother, at Page's request, agreed to bring T.W. to Children Services, limiting the extent of his control over his being there, and rendering his presence

ostensibly involuntary. *See Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140 (2004). Shortly after arriving at Children Services, T.W. was escorted away from his mother and step-father by two unfamiliar authoritarian figures, one of whom was dressed in a police uniform and carried a weapon on his person. *See In re R.H.*, 2d Dist. No. 22352, 2008-Ohio-773, ¶ 20. As Officer Rowe and Page escorted T.W. back to the interview room, Shimp and T.W.'s step-father attempted to follow them back but Officer Rowe advised them that they could not accompany them in the interview room. Last, upon entering the interview room the door was closed and T.W. was seated facing Officer Rowe, with either Officer Rowe or Page sitting near the door through which they entered the interview room. Regardless of who sat near the door, a reasonable juvenile in T.W.'s position would likely not feel free to stand, walk past the authoritarian figure seated near the door and out of the interview room.

**{¶30}** While the foregoing facts tend to weigh in favor of a finding that T.W. was in custody, other facts tend to weigh against a finding that T.W. was in custody. T.W. was not transported to the interview by a police officer. *See Yarborough* at 664. The interview occurred at Children Services as opposed to a police department. *But see In re K.W.*, 3d Dist. 9-08-57, 2009-Ohio-3152, ¶ 14 (child found to be in custody during interview at children services agency). The

parents waited in the lobby during the interview, suggesting that the interview would be brief. *See Yarborough* at 664. In the lobby, prior to the interview, Officer Rowe testified that he informed T.W., Shimp, and T.W.'s step-father that T.W. was not under arrest and free to go. Review of the taped interview and Officer Rowe's testimony reveals that T.W. was relaxed during much of the interview. Last, during the interview, at approximately eight and twenty-seven minutes into the interview, Officer Rowe informed T.W. that he was "not going to be arrested," and that he was "free to go, and [he is] not going to be arrested" that day, respectively.

{¶31} Upon balancing the foregoing facts, we find that the trial court did not err in granting T.W.'s motion to suppress. In so finding, we recognize that fair-minded jurists could disagree over whether T.W. was in custody, as evidenced by the dissent's opinion. However, under the circumstances of the instant case we agree with the trial court, that a reasonable juvenile in T.W.'s position would not have felt free to terminate the interview and leave the premises. Accordingly, we find that the trial court did not err in determining that T.W. was in custody.

{¶32} Since T.W. was in custody during the interview he should have been administered *Miranda* warnings. Upon review of the record, there is no evidence that T.W. was administered *Miranda* warnings or voluntarily waived the same.

Consequently, the State may not use any statements made during T.W.'s interview at trial. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

{¶33} Accordingly, we overrule the State's sole assignment of error.

{¶34} Having found no error prejudicial to the State herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, J., concurs in Judgment Only.**

**/jlr**

**SHAW, P.J., DISSENTS**

{¶35} I respectfully dissent from the majority's decision to affirm this case based upon its determination that T.W. was in custody. I would reverse the decision of the trial court, not because its findings of fact were unsupported by the record, but because its decision to suppress T.W.'s statements was based upon misconceptions of the law and T.W.'s rights thereunder. Furthermore, I believe the majority in reviewing this case has also relied upon erroneous suppositions in order to draw conclusions which are not consistent with the actual evidence presented in this case. Having reviewed the record and the law, I would find that

T.W. was not in custody, and accordingly, Officer Rowe was not required to advise T.W. of his *Miranda* rights.

**The Trial Court's Findings**

{¶36} As the majority correctly notes, our review of a trial court's decision on a motion to suppress presents a mixed question of law and fact, which requires that we accept the trial court's findings of facts as long as they are supported by competent, credible evidence and that we then conduct a de novo review of the trial court's application of the law to those facts.

{¶37} In this case, the audio of the interview was recorded and its content is unchallenged. There is no dispute that T.W. was brought to Children Services by his mother and step-father, that the mother and step-father were not present for the actual interview, or about the description of interview room and what Officer Rowe was wearing at the time. The only facts in dispute between T.W. and the State concerned what was said by Page and/or Officer Rowe to T.W. and his mother and step-father regarding whether his mother could be present for the interview and T.W.'s right to an attorney.

{¶38} In resolving this dispute, the trial court found that T.W.'s mother was advised of her ability to be present for the interview and of T.W.'s right to an attorney. However, the trial court found that these were T.W.'s rights, not his

mother's, and that there was no evidence to indicate that T.W. *affirmatively* waived these either orally or in writing. The trial court then proceeded to rule that a juvenile should have a parent or legal guardian present when being interviewed for purposes of a possible delinquency prosecution and that an attorney should be present with them unless both parent and juvenile sign a written waiver of legal representation, which clearly advises both of the juvenile's right to an attorney and evidences their waiver of this right.

{¶39} In determining that T.W. was in custody, the trial court relied upon T.W.'s age of fourteen, lack of prior criminal history, and the length of the interview and repeated denials by T.W. of any wrongdoing. The trial court also concluded that T.W. was not given an opportunity to end the interview or to consult with his mother or an attorney and that his mother should have been present along with an attorney (or a written waiver of his right to an attorney).

## **Problems with the Trial Court's Determination of Custody**

{¶40} Contrary to the foregoing factors relied upon by the trial court, the law provides no right to have a parent present when a juvenile is questioned by law enforcement about a possible delinquency prosecution. See *In re Watson* (1989), 47 Ohio St.3d 86, 89-90, 548 N.E.2d 210. Nor does the trial court or the majority identify any authority that renders an interview "custodial" because a

juvenile's parent or attorney is not present and the juvenile is not informed that he may have a parent and/or attorney present.

{¶41} As noted by the majority, a "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323. In addition, as noted by the majority, while the juvenile's age, when an officer is aware of it or it is objectively apparent to a reasonable officer, may be taken into consideration in determining custodial status, a person's prior inexperience with law enforcement may not. See *Alvarado*, supra; *J.D.B.*, supra. However, the primary question remains whether the circumstances surrounding the interrogation would lead a reasonable person to believe that he was not at liberty to terminate the interview and leave. *Stansbury*, supra.

## Problems with the Majority's Analysis

{¶42} Here, the majority finds it unreasonable to conclude that a child brought to Children Services by parents and then interviewed by a uniformed officer wearing a firearm would believe he had the option of terminating the interview and leaving the premises. The majority further finds that a collective advisement to the juvenile and his parent prior to the interview that the juvenile was free to leave and not under arrest, was not sufficient to support a finding that a

reasonable juvenile would have felt free to terminate the interview and leave the premises. They also conclude that a reasonable juvenile in an interview room with two authoritarian figures with whom he is not familiar, one of whom sat near the door, would not feel free to stand, walk past the adult, and out of the interview room. Lastly, the majority finds that Officer Rowe's statements during the interview again informing T.W. that he was not going to be arrested and that he was free to go, was not sufficient to convince a reasonable juvenile that he was actually free to leave the interview. I take exception to each of these conclusions.

{¶43} First, T.W.'s mother brought him to Children Services, not a police station, and, unlike the mothers in *In re T.F.*, 9th Dist. No. 08CA009449, 2009-Ohio-3141 , and *In re K.W.*, *supra*, she did not testify that she felt she had no other choice but to bring him for the interview.

{¶44} Second, although the majority relies upon the fact that Officer Rowe was armed, which he testified he was, there is no evidence in the record to indicate where his gun was located on his person, that the weapon was visible to T.W., or that Officer Rowe otherwise displayed and/or brandished it. Rather, Officer Rowe testified that he was on light duty so he was not wearing his gun belt or outside vest but that he did have his weapon on him. In fact, Page testified that she did not believe that Officer Rowe was wearing his gun during the interview, so she most

-21-

likely would not have seen it. Additionally, the trial court did not make any finding about the officer's weapon and its visibility to T.W. or even reference the weapon in its decision. Thus, without any additional information whatsoever as to the visibility of the weapon, I believe the majority improperly relies on the fact that Officer Rowe was armed to support its decision that a reasonable person would not feel at liberty to terminate the interview and leave because of the presence of a weapon.

{¶45} Third, the majority apparently questions, absent any direct evidence, whether a fourteen-year-old, such as T.W., who is in a lobby with his mother and step-father and is collectively advised along with his mother and step-father that he is free to leave and is not under arrest, could have heard and appreciated such advisements. However, under these circumstances outlined above, I find that the record amply supports an inference that T.W. was able to hear and comprehend such advisements.[3]

{¶46} For example, there is no evidence that T.W. was far away from this conversation or to otherwise indicate that he somehow would not be paying attention to what was said regarding an interview he was about to give with "two

---

[3] Notably, the trial court made no finding that T.W. did not hear this conversation. The only finding by the trial court in this regard was that T.W. had the right to have a parent and/or an attorney present for the interview and that there was no evidence that T.W. affirmatively waived these rights.

unfamiliar, authoritarian figures." To the contrary, both Officer Rowe and Page indicated that they spoke to the family, including T.W. The family was advised that T.W. was not under arrest and was free to leave.

{¶47} In sum, there is simply no basis in the record for the majority to conclude that a fourteen-year-old, who is the object of this type of discussion, under these circumstances would somehow not be paying attention and fail to understand that he is not under arrest and is free to leave. This case does not involve a young child who may not appreciate the nature of the interview or what it means to be free to leave and not under arrest. In fact, throughout the interview, T.W. was able to easily follow the conversation, answer questions without any problems, repeatedly assert his innocence, and in no way seemed incapable of hearing and understanding the conversation.

{¶48} Fourth, the majority's conclusion that a reasonable juvenile would not feel free to stand, walk past the authoritarian figures, and out of the interview room also ignores the evidence in the record. Page testified that during the conversation she had with the family that *T.W. was instructed* that if he ever felt uncomfortable or wanted to leave the room, he was welcome to do that. *T.W.* was also told that if he needed to take a break because things got too emotional for him, he could take a break. Additionally, T.W. knew his mother and step-father

were waiting in the lobby, and *the family* had been told that T.W.'s mother could be present for the interview but that the agency preferred that parents not be present. However, at no point did T.W. ask for a break, ask to speak to his mother or step-father, indicate that he did not want to talk any longer, or otherwise indicate that he wanted to terminate the interview and/or leave. Furthermore, Officer Rowe testified that T.W. was somewhat relaxed during the interview and understood what was happening. A review of the audio recording also reveals that T.W.'s tone of voice is conversational, and he does not appear tired or emotionally stressed.

{¶49} Lastly, the majority concludes that Officer Rowe's statements to T.W. during the interview at eight minutes and again at twenty-seven minutes, respectively, informing T.W. for the third time that day that he was not going to be arrested and that he was free to go, was still not sufficient to convince a reasonable juvenile that he was actually free to leave the interview. Such a conclusion is pure conjecture and is not remotely supported by the record in this case.

{¶50} These statements, while in the midst of a line of questioning, were not rushed or made in a way that was confusing or misleading. They were plain and simple statements made to a fourteen-year-old who was more than capable of following along with the conversation, answering questions thoroughly, asking

questions when needed, and able to comprehend what was being said to him.[4] The interview was civil, voices were not raised, and the language used by Officer Rowe was never complicated.

{¶51} In addition, when Officer Rowe made the second statement during the interview regarding T.W.'s custodial status, he not only told T.W. that he was free to go but that he was not going to be arrested and would return home with his parents or to school that day, or "wherever your day takes you." He then told T.W. that *he would like* for him to tell him the truth today before he went to the trouble of a lie detector test in a couple of weeks. He advised him, however, that he was not threatening T.W. and was not telling T.W. that he was going to take T.W. "to jail or anything like that." To find that a reasonable juvenile would not feel free to terminate the interview and leave after being told in no uncertain terms that he was not under arrest and free to leave prior to an interview in the company of his parents and again at two separate and distinct points in an interview presumes that fourteen-year-olds are incapable of discerning sincerity or

---

[4] Although T.W. was not able to accurately spell the words "touch" or "Dakota" in his written statement, everything else in his interview with Officer Rowe demonstrated that he was able to *comprehend* what was being said and asked of him. We note that many adults from ages 18 to 80 have trouble spelling, but this does not render them incapable of comprehending what is said to them.

comprehending what these statements mean, a presumption totally unsupported by any facts in the record.

{¶52} More importantly, under the majority's view, an officer would have to essentially engage in a *Miranda*-like analysis to determine whether a juvenile is in custody, i.e. like each right of *Miranda*, the officer would have to ask whether the juvenile understood he was not in custody. Neither the Constitutions of the United States or Ohio nor the case law interpreting them requires that an officer make such an affirmative determination.

{¶53} In this case, the record reflects that T.W. was fourteen, that he was brought to Children Services by his mother and step-father, that the family was told that his mother could be present and that T.W. was not under arrest and was free to leave, and that his mother and step-father waited for him in the lobby while he was interviewed for just over an hour. In addition, T.W.'s voice sounded relaxed and he appeared able to understand what was being said during the interview. T.W. was able to respond to the questions without any problems, and Officer Rowe never raised his voice or otherwise acted uncivilized towards T.W.

{¶54} More importantly, T.W. was told prior to the interview that he could take a break if he needed to do so and was told during the interview at two separate times in plain words that he was free to leave and was not under arrest.

T.W. never asked in any way for a break, to terminate the interview, or to leave. Further, there was no other evidence that T.W. somehow felt compelled to stay. Given all of these circumstances, I believe it is unreasonable for this court to determine that T.W. was in custody. Thus, *Miranda* does not apply, and the trial court erred in suppressing his statements. I would reverse the decision of the trial court and remand for further proceedings.

**/jlr**