[Cite as *In re C.M.*, 2013-Ohio-5426.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99599**

# IN RE: C.M.
# A Minor Child

## JUDGMENT:
### AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL 12112363

**BEFORE:** Jones, J., Boyle, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** December 12, 2013

**ATTORNEYS FOR APPELLANT**

Timothy Young
State Public Defender

Sheryl A. Trzaska
Assistant State Public Defender
250 East Broad Street
Suite 1400
Columbus, Ohio 43215


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Amey L. Tucker
Assistant County Prosecutor
9300 Quincy Avenue, 4th Floor
Cleveland, Ohio 44106

LARRY A. JONES, SR., J.:

{¶1} Juvenile-appellant, C.M., appeals his adjudications of delinquent of felonious assault with firearm specifications.   We affirm.

I.   Procedural History

{¶2} In July 2012, then 15-year-old C.M. was charged with three counts of felonious assault.   Each count contained a one-year firearm specification under R.C. 2941.141(A), a three-year firearm specification under R.C. 2941.145(A), and a five-year "drive-by shooting" firearm specification under R.C. 2941.146(A).   The named victim of Count 1 was E.A.; the named victim of Count 2 was I.G.; and the named victim of Count 3 was E.M.   Co-delinquent L.W. was charged with the same crimes in the same complaint.[1]

{¶3} C.M. and L.W. were tried in a joint bench trial in December 2012.   At the conclusion of the case, C.M. moved the court for a dismissal under Juv.R. 29; the court denied the motion.   The defense rested without presenting any evidence.   After deliberations, the court found C.M. delinquent on the charges and specifications.

{¶4} At disposition, the trial court committed C.M. to the legal custody of the Ohio Department of Youth Services for an indefinite term of a minimum period of 12 months and a maximum period not to exceed his 21st birthday.   The court merged the one-year

---

[1]This case is the companion case to L.W.'s appeal.   *See In re L.W.*, 8th Dist. Cuyahoga No. 99527.

firearm specifications under R.C. 2941.141(A) and the three-year firearm specifications under R.C. 2941.145(A), and committed C.M. to custody for an additional year. The court further committed C.M. to custody an additional year for the specification under R.C. 2941.146(A). The commitments on the specifications were ordered to be served consecutively to each other and the commitment on the underlying offenses.

## II. Facts

{¶5} On July 23, 2012, victim E.B.[2] was shot in the head while he was walking with the other two victims in the area of St. Clair Avenue and East Boulevard in Cleveland, Ohio. The shooting occurred at approximately 2:00 a.m. By all accounts, E.B. and the other two victims had had two encounters with co-delinquents C.M. and L.W. leading up to the shooting. The first encounter occurred late in the evening on July 22 or very early in the morning on July 23, and the second one occurred moments prior to the shooting.

**The First Encounter**

{¶6} At the time of the first encounter, E.B. and the other two victims were walking to a friend's house when a car approached them. E.B. testified that co-delinquent L.W. was driving the car. E.B. was previously acquainted with L.W., had a "pretty clear" view of him, and was 100 percent sure he was the driver. Victim E.M., who was also previously acquainted with co-delinquent L.W., also identified L.W. as the

---

[2]E.B. was the named victim, E.A., in Count 1 of the complaint. At trial, he was referred to by his nickname, E.B. For the sake of clarity, we will also refer to him as E.B.

driver and testified that he was 100 percent sure.

{¶7} E.B. testified that he and the other two victims "exchanged some words" with L.W. and the occupants in his car. According to statements provided to the police by C.M. and co-delinquent L.W. after the incident, L.W. was the driver, C.M. was the front seat passenger, and there was a backseat passenger. Further, co-delinquent L.W. admitted in his statement that "words were exchanged" with the victims.

{¶8} All three victims testified that someone in the car asked them what neighborhood they were from; E.B. and E.M. specifically testified that it was L.W. who asked. All three victims testified that they responded "nowhere." In his statement to the police, co-delinquent L.W. stated that he asked the question and that the victims said "Cut Throat," which is a gang. Co-delinquent L.W. told the police that he asked if they were from "76," another gang, and they said no. According to co-delinquent L.W., he said "F 76 we're from 'Hough Harlem'" and drove away. "76" and "Hough Harlem" were feuding gangs. According to victim E.B., L.W. said something to the effect of "that's good because I thought you guys were from 76 and was going to get busting you all." "Busting" is a term for shooting.

{¶9} After L.W. drove off, the victims continued to walk to their friend's house. Once at the house, they stayed and visited for approximately 45 minutes. They left on foot, and had planned on walking to E.B.'s sister's house where they were going to go to sleep.

**The Second Encounter**

{¶10} While walking to E.B.'s sister's house, the victims saw the same car from earlier that evening. E.B. and E.M. testified that L.W. was again driving, and in his statement to the police, L.W. admitted as such. By all accounts (including that of the co-delinquents), L.W. honked at the victims and then shots were fired. The testimony varied about where the shots came from.

{¶11} E.B. testified that nobody saw where the shots came from. Rather, he and the other victims "just heard them and the car was the only thing around so * * * we put it on the car." E.B. testified that he was "positive" that there were no other cars around. He further testified that there were no bushes from where the shooting could have occurred and no trees in the immediate area.

{¶12} E.M. testified that he did not know where the shots came from. He admitted that when he spoke with the police that morning he told them that the shots came from the passenger side of the car L.W. was driving. He testified that he told the police that because the car was the "only thing around at the time."

{¶13} I.G. testified that when he heard the shots he looked across the street and saw "sparkles" in the bushes. When interviewed by the police the morning of the incident, I.G. said that he saw "muzzle flashes" coming out from the bushes. He told the police that the shots did not come from the car.

{¶14} C.M. and co-delinquent L.W. voluntarily went to the police station with their mothers on separate occasions. Detective Michael Legg conducted both interviews. Prior to taking the delinquents' statements, Detective Legg advised the

delinquents and their mothers of their *Miranda* rights. The interviews were audio recorded.

{¶15} In his statement, L.W. said that after he honked at the victims, victim E.B. "put up the deuces," and as he continued to drive, he heard gunshots and thought the victims were shooting at his vehicle. L.W. stated that C.M. was in the front passenger seat, but added that the air conditioning was on and the windows were up.

{¶16} In his statement, C.M. admitted that he was the front seat passenger. He stated that L.W. honked, and then gunshots were fired, but he did not know from where.

**Additional Testimony**

{¶17} I.G. testified that he and E.M. smoked weed as they walked to the friend's house. But at the friend's house, I.G. was the only person who smoked weed. He testified that he smoked some weed approximately ten minutes before they left the friend's house for E.B.'s sister's house because his earlier high was "wearing down." E.M. denied that any of the victims had been drinking or doing drugs that evening or morning, however.

{¶18} None of the witnesses testified that they saw any weapons during the incident or the encounters. No physical or forensic evidence tied anyone to the crime.

### III. Assignments of Error

{¶19} C.M. now raises the following assignments of error for our review:

[I.] [C.M.'s] adjudication for felonious assault and the corresponding firearm specification were supported by insufficient evidence, and against

the manifest weight of the evidence.

[II.] The juvenile court committed plain error when it admitted [C.M.'s] statement to law enforcement at trial, as [C.M.] did not knowingly, intelligently, or voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed 2d 694 (1966).

[III.] The juvenile court committed plain error by finding [C.M.] delinquent of and committing him to DYS on the specifications outlined in R.C. 2941.145 and 2941.146, for the same conduct.

[IV.] Trial counsel was ineffective for failing to file a motion to suppress [C.M.'s] uncounseled statement to law enforcement, and because counsel failed to request that [C.M.] and his co-defendant be tried separately.

IV.   Law and Analysis

**C.M.'s Statement**

{¶20} For ease of discussion, we consider the assignments of error out of order. In his second assigned error, C.M. challenges the trial court's admission of his statement to law enforcement.   Counsel did not object to its admission and, therefore, we review for plain error.   To have plain error under Crim.R. 52(B), there must be an error that constitutes an "obvious" defect in the trial proceedings and that affects the defendant's "substantial rights."   *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶21} We may reverse under a plain-error standard only where the defendant can demonstrate that "but for the error, the outcome of the trial clearly would have been otherwise."   *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.   "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."   *Id.* at paragraph three of the syllabus.

**{¶22}** C.M. contends that his statement, which was contained on an audio recording, was improperly admitted because (1) the state did not lay a proper foundation, and (2) he did not knowingly, intelligently, and voluntarily waive his right against self-incrimination or right to counsel.

**{¶23}** In regard to the foundation for admission of his statement, C.M. contends that it was not proper because Detective Legg neither identified the voice on the audio recording as C.M.'s nor identified C.M. at trial as the person he interviewed during his investigation.

**{¶24}** At the beginning of his testimony, the state asked Detective Legg what he did to investigate this case. He responded, in part, that he "conducted interviews with [L.W.] and [C.M.]." After the detective testified about his interview with L.W., the state asked, "[w]ere you able to interview [C.M.] in this case?" The detective responded "[y]es." The state then proceeded to question Legg about his interview of C.M., and C.M.'s attorney objected on the ground of the "best evidence rule." His attorney contended "[w]e have a tape of this entire conversation. * * * We have a complete tape. * * * Judge, I would ask that you listen to it in it's [sic] entirety. That's the best evidence." The court responded, "[o]kay. All right. Let's hear the tape then."

**{¶25}** At the beginning of the audio recording, the detective stated the date, time, and place of the interview, as well as the following: "Interviewing [C.M.], juvenile male fifteen years old. [C.M.], can you state your full name and your date of birth please." C.M. complied, and the name and date of birth he gave matched the name and date of

birth on the complaint.

{¶26} In light of the above, C.M.'s challenge on the admission of the recording on the ground of lack of identity is without merit. A foundation was laid that the interview in question was of C.M. Further, the audio recording specifically states so. Moreover, the recording was played at trial at counsel's request because he believed that the state was going to misinterpret some of C.M.'s responses. There was no plain error in its admission.

{¶27} We now consider C.M.'s contention that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights.

{¶28} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. In order to protect this right, statements resulting from custodial interrogations are admissible only after a showing that law enforcement officers have followed procedural safeguards. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, *Miranda* warnings are only required when an individual is subjected to "custodial interrogation." *Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *State v. Mason*, 82 Ohio St.3d 144, 153-54, 694 N.E.2d 932 (1988).

{¶29} C.M. contends that he was subject to a custodial interrogation; the state, on the other hand, contends that he was not.

{¶30} Custodial interrogation is defined in *Miranda* as any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise

deprived of his freedom of action in any significant way." *Id.* at 444.

The Ohio Supreme Court has set forth two inquires for determining whether a person is in custody for purposes of *Miranda*. First, the circumstances surrounding the questioning should be considered, and second, given those circumstances, a determination should be made as to whether a reasonable person would have felt that he was at liberty to terminate the interview and leave. *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 27. "Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve the ultimate inquiry of whether there was a formal arrest or restraint in freedom of movement of the degree associated with a formal arrest." *Id.*

**{¶31}** C.M. cites two cases in support of his contention that he was in custody when the police interviewed him*: In the Matter of: T.W.*, 3d Dist. Marion No. 9-10-63, 2012-Ohio-2361, and *In the Matter of: J.S.*, 12th Dist. Clermont No. CA2011-09-067, 2012-Ohio-3534.

*In the Matter of: T.W.*

**{¶32}** In *T.W.*, the state appealed a trial court decision granting the juvenile's motion to suppress. The 14-year-old juvenile was charged with gross sexual imposition after an allegation had been made that he had had inappropriate sexual contact with his four-year-old half-sister.

**{¶33}** After the allegation came to the attention of the county's children services, an intake investigator contacted the juvenile's mother to advise her of the allegation and

inform her that the agency would be conducting a full investigation. The investigator also told the mother of the possible charges her son was facing. The investigator arranged a time with the mother for the juvenile to be interviewed at the children services office.

{¶34} The mother and the step-father drove the juvenile to the office of children services for the interview. According to the investigator, she met the juvenile and his parents in the lobby, and advised the parents that the agency preferred to interview children alone, but that the parents could accompany the juvenile in the interview room or watch the interview in an adjacent conference room via a live video feed. The investigator further testified that she gave the parents a "consumer brochure" that explained their rights and the mother signed a document acknowledging receipt of same.

{¶35} A uniformed local police officer conducted the interview with the investigator. The officer testified that, prior to the interview, he met with the juvenile and his parents in the lobby of the building and advised them that the juvenile was not under arrest and that he was free to leave. According to the officer, he never specifically advised the juvenile that he could have his parents accompany him in the interview room or that he could have an attorney present, but he advised the parents that they could accompany the juvenile to the interview room and the juvenile was present when the parents were so advised.

{¶36} But the mother testified the investigator only told her that she and a local police officer were going to interview her son. The mother denied that she and the

step-father were ever presented with the opportunity to watch the interview via a live video feed. According to the mother, when the investigator and police officer escorted her son to the interview room, she and the step-father stood up to follow, but the investigator told them they were not permitted in the interview room.

{¶37} The juvenile was interviewed by the investigator and police officer for approximately one hour, and after denying the allegation approximately 15 times, admitted it near the end of the interview. He was not given *Miranda* warnings.

{¶38} In finding that the trial court did not err in granting the juvenile's suppression motion, the Third Appellate District recognized that "fair-minded jurists could disagree over whether T.W. was in custody * * *." *T.W.* at ¶ 31. But, "under the circumstances" of the case, the court agreed with the trial court that a "reasonable juvenile in T.W.'s position would not have felt free to terminate the interview and leave the premises." *Id.*

{¶39} In support of its finding, the court noted that, given the juvenile's age of 14, "a reasonable juvenile in T.W.'s position would, in all likelihood, be intimidated and overwhelmed." *Id.* at ¶ 29. Further, the juvenile did not voluntarily go to the interview; rather, it was arranged at the behest of children services. Moreover, his parents were not allowed in the interview room with him.

*In the Matter of: J.S.*

{¶40} In *J.S.*, the juvenile sought suppression of statements he made to the police, without benefit of *Miranda* warnings, in connection with a rape charge against him. The

Twelfth Appellate District found that the juvenile was in custody at the time the statements were made.

{¶41} The court's decision was based on the following: (1) the juvenile did not voluntarily go to the police station; rather, his father was instructed by the police to follow them to the station so that his son could be questioned; (2) the juvenile was 13 years old at the time of the interview; and (3) although the interviewing detective testified that he told the juvenile that he was not under arrest, that contention was not supported by the videotape of the interview; rather, the detective told the juvenile that he would be going home after the interview, but implied at times that the interview would end once the juvenile "finally told the truth." *In the Matter of J.S.* at ¶ 14.

{¶42} We find *T.W.* and *J.S.* distinguishable from this case. In *T.W.* and *J.S.*, the juveniles were not advised at all of *Miranda* warnings. Here, C.M. was advised. According to C.M., although he was advised of the *Miranda* warnings, Detective Legg did not obtain a knowing, intelligent, and voluntary waiver of his rights because the detective never asked him if he wished to waive them. But, based on the facts here, C.M. was not in custody and, therefore, *Miranda* was not even implicated.

{¶43} We note the following in support of our conclusion that C.M. was not in custody. Unlike the juveniles in *T.W.* and *J.S.*, C.M. voluntarily went to the police station. We are not persuaded by C.M.'s contention that his appearance at the police station was involuntary because his mother was with him, that is, his mother made him go. Detective Legg asked C.M. why he came to the station, and C.M. told him it was

because he had heard his name mentioned in regard to a shooting; he did not indicate that his mother made him go. The situation here was different from the juveniles in *T.W.* and *J.S.*, where the parents were directed by authorities to have their children submit to interviews.

{¶44} Further, unlike the juveniles in *T.W.* and *J.S.*, C.M.'s mother was in the interview room with him. Although, as we have found, a reading of *Miranda* rights was not required, both C.M. and his mother were advised of their rights, and both indicated that they understood them.

{¶45} C.M. contends that Detective Legg took an "antagonistic view" toward him, said that he had been identified as the shooter, and challenged his recitation of the events. But, unlike the juveniles in *T.W.* and *J.S.*, C.M. did not confess to the crime.

{¶46} On the record before us, we find that C.M. was not in custody for the purpose of *Miranda* at the time of his interview with Detective Legg. The second assignment of error is, therefore, overruled.

**Sufficiency and Weight of the Evidence**

{¶47} In his first assignment of error, C.M. challenges the sufficiency and weight of the evidence. For his sufficiency argument, C.M. contends that the state did not present sufficient evidence of his identity or that he was the shooter.

{¶48} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally

sufficient to support a verdict is a question of law. *Id.*

**{¶49}** In determining whether the evidence is legally sufficient to support a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in the light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

**{¶50}** According to C.M., "none of the witnesses identified [him] in any way, and the circumstances of the trial did not indicate that [he] was the person about whom the witnesses were testifying." C.M. also contends that there was no evidence that he shot at the victims.

**{¶51}** It is well established that in the prosecution of a criminal case, the state must prove "beyond a reasonable doubt the identity of the accused as the person who actually committed the crime." *In re K.S.*, 8th Dist. Cuyahoga No. 97343, 2012-Ohio-2388, ¶ 32. "In-court identification of the defendant by a victim or witness may be the most common method of establishing such identity, but it is not mandatory." *Cleveland Metroparks v. Lawrence,* 8th Dist. Cuyahoga No. 98085, 2012-Ohio-5729, ¶ 13.

**{¶52}** "The failure to conduct an in-court identification is not fatal to the state's case when the circumstances of the trial indicate that the accused is indeed the person

about whom the witnesses are testifying." *State v. Melton*, 8th Dist. Cuyahoga No. 87186, 2006-Ohio-5610, ¶ 16.

**{¶53}** As already discussed, C.M.'s statement to the police was properly admitted. In his statement, he admitted that he was the front-seat passenger in the car L.W. was driving. E.B. testified that C.M. was the front-seat passenger. Moreover, C.M. stipulated to his date of birth at trial; the birth date was the same as that given in his tape recorded interview with the police.

**{¶54}** On this record, there was sufficient evidence of C.M.'s identity. Further, although it was never demonstrated at trial who in L.W.'s car fired the shots, the state presented sufficient evidence under which C.M. could be convicted as either the principal offender or an accomplice. Under R.C. 2923.03(F), an accomplice to a crime is subject to the same prosecution and punishment as the principal offender; the statute applies in juvenile prosecutions. *See In re R.G.*, 8th Dist. Cuyahoga No. 90389, 2008-Ohio-6469, ¶ 73.

**{¶55}** There was sufficient evidence that shots were fired at the victims from the car L.W. was driving, and in which C.M. was the front-seat passenger. The shots were fired after the co-delinquents had had an earlier encounter with the victims where "words were exchanged" over gang territory.

**{¶56}** In light of the above, C.M.'s sufficiency challenge is without merit.

**{¶57}** For his manifest weight of the evidence argument, C.M. contends that the following demonstrates that the weight of the evidence does not support his conviction:

(1) the state's witnesses gave conflicting testimony; (2) no one saw C.M. fire a gun; (3) the lack of physical or forensic evidence; and (4) E.B.'s injury was inconsistent with the state's theory of the case.

{¶58} A manifest weight challenge questions whether the prosecution met its burden of persuasion. *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). When considering a manifest weight challenge, a reviewing court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380 at 387. A judgment should be reversed as against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶59} In regard to the conflicting testimony, although we consider the credibility of the witnesses in a weight-of-the-evidence review, "that review must nevertheless be tempered by the principle that weight and credibility are primarily for the trier of fact" because it is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Kash*, 1st Dist. Hamilton No. CA2002-10-247, 2004-Ohio-415, ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶60} Thus, as to the conflicts in the witnesses' testimony, we defer to the trial

court's resolution of same, and find that this was not an exceptional case in which the evidence weighed heavily against the conviction.

**{¶61}** As to C.M.'s argument that no one saw him fire a gun and the lack of physical and forensic evidence, we note that "[p]roof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988).

> Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492. "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

**{¶62}** The state presented competent, credible circumstantial evidence that the shots came from the car L.W. was driving, in which C.M. was the front-seat passenger. The incident occurred at approximately 2:00 a.m. and there was testimony presented that no other cars or people were around. There was also testimony that, during the first encounter between the two groups, words were exchanged and co-delinquent L.W. made reference to shooting at the victims. When interviewed by the police on the morning of

the incident, E.M. said that the shots came from the front passenger side of the vehicle.

**{¶63}** We recognized that there were inconsistencies in the victims' testimony. But those inconsistencies and the state's proffered reason for them — that co-delinquent L.W. had threatened the victims — were not so incredible as to render the conviction exceptional because the trier of fact clearly lost its way and created a manifest miscarriage of justice.

**{¶64}** In light of the above, the first assignment of error is overruled.

## R.C. 2941.145 and 2941.146 Firearm Specifications

**{¶65}** For his third assigned error, C.M. contends that the trial court "lacked authority to adjudicate him delinquent of firearm specifications under both R.C. 2941.145 and 2941.146 for the same conduct, in violation of R.C. 2941.25(A)."

**{¶66}** R.C. 2152.17 governs commitments for specifications in juvenile cases, and provides in part as follows:

> (A) Subject to division (D) of this section, if a child is adjudicated a delinquent child for committing an act, other than a violation of section 2923.12 of the Revised Code, that would be a felony if committed by an adult and if the court determines that, if the child was an adult, the child would be guilty of a specification of the type set forth in section 2941.141, 2941.144, 2941.145, 2941.146, 2941.1412, 2941.1414, or 2941.1415 of the Revised Code, in addition to any commitment or other disposition the court imposes for the underlying delinquent act, all of the following apply:
>
> * * *
>
> (2) If the court determines that the child would be guilty of a specification of the type set forth in section 2941.145 of the Revised Code * * * the court *shall* commit the child to the department of youth services for the specification for a definite period of not less than one and not more than three years, and the court also shall commit the child to the department for

the underlying delinquent act under sections 2152.11 to 2152.16 of the Revised Code.

(3) If the court determines that the child would be guilty of a specification of the type set forth in section 2941.144, 2941.146, or 2941.1412 of the Revised Code * * * the court *shall* commit the child to the department of youth services for the specification for a definite period of not less than one and not more than five years, and the court also shall commit the child to the department for the underlying delinquent act under sections 2152.11 to 2152.16 of the Revised Code.

* * *

(E) The court shall not commit a child to the legal custody of the department of youth services for a specification pursuant to this section for a period that exceeds five years for any one delinquent act. Any commitment imposed pursuant to division (A), (B), (C), or (D)(1) of this section shall be in addition to, and shall be served consecutively with and prior to, a period of commitment ordered under this chapter for the underlying delinquent act, and *each commitment imposed pursuant to division (A), (B), (C), or (D)(1) of this section shall be in addition to, and shall be served consecutively with*, *any other period of commitment imposed under those divisions.* If a commitment is imposed under division (A) or (B) of this section and a commitment also is imposed under division (C) of this section, the period imposed under division (A) or (B) of this section shall be served prior to the period imposed under division (C) of this section.

* * *

(Emphasis added.)

{¶67} Thus, under the governing statutory mandates, the trial court is not given discretion when sentencing juveniles on delinquencies for firearm specifications under R.C. 2941.145 and 2941.146. Further, the above-mentioned statutory provisions apply regardless of whether the juvenile was adjudicated delinquent as the principal offender or an accomplice. *See* R.C. 2152.17(B)(2).

{¶68} We are not persuaded by C.M.'s contention that, under an allied offenses

analysis, he could not have been sentenced for both the three- and five-year firearm specifications. According to C.M., the adult sentencing statutes specifically allow for such a sentence under R.C. 2929.14(B)(1)(c), but the juvenile disposition statutes do not. We disagree.

{¶69} C.M. was sentenced for the firearm specifications under Subsection A of R.C. 2152.17. Subsection E of that statute specifically provides that

> [a]ny commitment imposed pursuant to division (A) * * * of this section shall be in addition to, and shall be served consecutively with and prior to, a period of commitment ordered * * * for the underlying delinquent act, *and* each commitment imposed pursuant to division (A) * * * of this section shall be in addition to, and shall be served consecutively with, any other period of commitment imposed under those divisions.

(Emphasis added.) R.C. 2152.17(E).

{¶70} Citing R.C. 2152.17(A)(3) and 2152.17(D), Professors Paul C. Giannelli and Patricia Yeomans Salvador state the following:

> If the underlying offense involves a drive-by shooting, the child *must* receive an additional term of commitment of one to five years.
>
> * * *
>
> These additional terms must be served consecutively and prior to the child's regular term of commitment, provided that the total period of commitment may not exceed age twenty-one.
>
> * * *
>
> * * * If the child received an additional term due to a firearms or gang specification, any consecutive terms shall be served immediately following the expiration of the additional firearms specification term, but the child may not be committed for a period that exceeds age twenty-one.

(Emphasis added.) Giannelli & Yeomans Salvador, *Ohio Juvenile Law*, Section 22:3,

316-317 (2013 Ed.).

**{¶71}** In light of the above, the trial court properly sentenced C.M. to separate and consecutive commitments.   The third assignment of error is, therefore, overruled.

**Ineffective Assistance of Counsel**

**{¶72}** For his fourth and final assignment of error, C.M. contends that his trial counsel was ineffective for failing to (1) file a motion to suppress, (2) request a trial separate from L.W., and (3) object to the commitment imposed by the trial court.

**{¶73}** We review a claim of ineffective assistance of counsel under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   In order to prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that his counsel's performance fell below an objective standard of reasonable representation; and if so, show there was a reasonable probability that his counsel's errors affected the outcome of the proceedings.   *Id.*

<u>Motion to Suppress</u>

**{¶74}** C.M.'s claim that his counsel was ineffective by not filing a motion to suppress is rooted in his contention that he did not make a knowing, intelligent, or voluntary waiver of his *Miranda* rights.   As already discussed, *Miranda* was not triggered because C.M. was not subjected to a custodial interrogation.

**{¶75}** Moreover, although R.C. 2151.352 provides that a juvenile may not waive his right to counsel without consultation with a parent, guardian, or attorney in a delinquency proceeding, that statutory right has not been extended in Ohio to include

interrogations. The Ohio Supreme held that the term "proceedings" as used in R.C. 2151.352 means court proceedings. *In re M.W.*, 133 Ohio St.3d 309, 2012-Ohio-4538, 978 N.E.2d 164, syllabus. Thus, a juvenile is statutorily entitled to representation by legal counsel when a complaint against him has been filed or upon his initial appearance in juvenile court. *Id.* When Detective Legg questioned C.M., a complaint had not yet been filed against him and, therefore, he was not entitled to representation at that time.

{¶76} In light of the above, counsel was not ineffective for not filing a motion to suppress.

Separate Trials

{¶77} We are also not persuaded by C.M.'s contention that his counsel was ineffective for not requesting a trial separate from L.W. because by not doing so he was denied his right of confrontation when the state introduced L.W.'s statement, because L.W. did not testify at trial. C.M. cites to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); and *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶78} These cases and the Sixth Amendment right to confrontation deal with instances where statements made to the police by a non-testifying person inculpate the defendant. L.W.'s statement did not inculpate C.M. Rather, L.W. denied that he and C.M. committed the crime, and was similar in that regard to the statement C.M. gave to the police. Thus, L.W. was not a witness against C.M., and C.M.'s right to

confrontation was not violated by the joint trial.

**{¶79}** In light of the above, trial counsel was not ineffective for failing to request a separate trial for C.M. The fourth assignment of error is, therefore, overruled.

**{¶80}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the juvenile court to carry this judgment into execution. The trial court's adjudications of delinquent having been affirmed, any bail pending appeal is terminated. Case remanded to the juvenile court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., JUDGE

MARY J. BOYLE, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR